## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

Former WPD Deputy Chief Wanda Givens,
Former WPD Deputy Chief Chet Pinkston, and
WPD Deputy Chief Jose Salcido,

Plaintiffs,

*v.*                                                          Case No. 23-CV-1033

City of Wichita,
City Manager Robert Layton,
Former Human Resources Director Chris Bezruki,
The Fraternal Order Of Police, Lodge No. 5, Wichita,
Kansas,
Former WPD Interim Chief Troy Livingston,
Former WPD Captain Kevin Kochenderfer,
WPD Captain Wendell Nicholson,
WPD Detective Dave Inkelaar, and
WPD Officer Paul Zamorano,

Defendants.

_____

## FIRST AMENDED COMPLAINT

COMES NOW James A. Thompson, of Malone, Dwire & Thompson, LLC, on behalf of Plaintiffs, and submits this First Amended Complaint. In support, Plaintiffs state as follows:

## INTRODUCTION

This case is about racism, sexism, undue violence, harassment, cronyism, corruption, and retaliation by public officials and organizations within Wichita. It is, sadly, about people tasked with upholding the Constitution who have done the precise opposite, trampling on Plaintiffs' fundamental rights while also abusing their own stations. Defendants, as described below, acted in ways intolerable to a civilized society. This behavior comprised not only repugnant statements and misconduct but also a concerted and ongoing effort to shield bad actors while also injuring

Plaintiffs. Defendants conspired to defame and disempower Plaintiffs and succeeded in doing so, to the detriment of not only Plaintiffs but also Wichita and the rule of law generally.

This action is brought, pursuant to 42 U.S.C. §§ 1981, 1983, and 1985, to redress a conspiracy to violate Plaintiffs' civil rights, and actual violations pursuant thereto, by Defendants. These rights were and are secured by the United States Constitution, including its First and Fourteenth Amendments, and federal statutes. Further, Plaintiffs bring Kansas state law claims, pursuant to the same underlying facts and circumstances, for defamation, outrageous conduct, and civil conspiracy.

## JURISDICTION AND VENUE

1.      This Court possesses jurisdiction to hear these claims under 28 U.S.C. §§ 1331 and 1343. Plaintiffs' state law claims arise under the laws and Constitution of the State of Kansas, over which this Court may exercise supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

2.      The amount in controversy exceeds $75,000.00, exclusive of costs and interest.

3.      Plaintiffs served Defendant City of Wichita with proper and sufficient notice, pursuant to K.S.A. 12-105b(d), on September 22, 2022, for Plaintiffs Salcido, Pinkston, and Givens, detailing the facts of Plaintiffs' state law claims, and complying with all aspects of Kansas substantive and procedural law relating to claims against municipalities, pursuant to the Kansas Tort Claims Act. Defendant City of Wichita formally denied Plaintiffs' claim submitted pursuant to K.S.A. §12-105b on October 5, 2022.

4.      Venue is proper as all the claims occurred within Sedgwick County, Kansas, and the vast majority of the parties are from Sedgwick County, Kansas.

## PARTIES

5.      Plaintiff Wanda Givens was a Deputy Chief and 34-year veteran of the Wichita

Police Department. Ms. Givens retired from the WPD on January 3, 2022, due to the hostile work environment created by Defendants. She is a resident of Sedgwick County, Kansas.

6.      Plaintiff Jose Salcido is a Deputy Chief and 27-year veteran of the Wichita Police Department; he is still employed by the City of Wichita. However, Mr. Salcido spoke out on matters of public concern, as described herein, and has been retaliated against as a result thereof. He is a resident of Sedgwick County, Kansas.

7.      Plaintiff Chester Pinkston was a Deputy Chief and 32-year veteran of the Wichita Police Department. Mr. Pinkston retired from the WPD on February 17, 2023, due to the hostile work environment created by Defendants. He is a resident of Harvey County, Kansas.

8.      Individual Defendants are being served at their places of employment in an effort not to publish their home addresses due to public concerns about officer safety.

9.      Defendant City of Wichita, Kansas (hereinafter, "City"), is a city and municipality organized under the laws of the State of Kansas. The City may be served with process by serving the Wichita City Clerk, and the Wichita City Council, at 455 N. Main, Wichita, Kansas 67202. The City is liable via respondeat superior for the actions of its agents and employees for all state law claims alleged herein. The City is liable for all damages arising from the acts or omissions of City employees and their violations of state or federal law, pursuant to the Kansas Tort Claims Act, K.S.A. § 75-6103 (liability of government entities for damages caused by employee acts or omissions) and § 75-6116 (duty to pay judgments or settlements for civil rights violations). The City is, pursuant to *Monell v. New York City Dept. of Social Services*, 436 U.S. 658 (1978), liable under 42 U.S.C. § 1983 for any formal, unwritten, or *de facto* policy made by final policymakers that violates federal law or the United States Constitution.

10.     Defendant Robert Layton is and was, at all times relevant to this action, the City

Manager of the City. As such, he acted under the color of law, and in the scope of his employment, at all times relevant to this action. He is sued in his individual capacity. He may be served with process at his place of employment at 455 N. Main, Wichita, Kansas 67201.

11.     Defendant Chris Bezruki was the Human Resources Director for the City at all times relevant to this action. As such, he acted under the color of law, and in the scope of his employment, at all times relevant to this action. He is sued in his individual capacity. He may be served with process at his current Virginia home, located at 1931 Crescent Park Dr., Reston, VA 20190.

12.     Defendant Fraternal Order of Police—Wichita Lodge #5 ("FOP") is a not-for-profit corporation registered to do business in the State of Kansas. It may be served with process by serving its resident agent, Paul Zamorano, at 477 N Seneca St., Wichita, KS 67203. The FOP is liable for the acts of its employees, officers, and agents under respondeat superior, and for the actions of final policy makers under *Monell v. New York City Dept. of Social Services*, 436 U.S. 658 (1978).

13.     Defendant Troy Livingston is a former Deputy Chief of Police, and former interim Chief of Police, for the City. As such, he was a duly appointed agent authorized to enforce the laws of the City and the State of Kansas, and so acted under the color of law and in the scope of his employment at all times relevant to this action. He is sued in his individual capacity. He may be served with process by serving him at his current place of employment, the Kansas Law Enforcement Training Center, at 11009 S. Hornet Road, Hutchinson, Kansas 67501.

14.     Defendant David Inkelaar is a detective for the City's Police Department (hereinafter, "WPD"). As such, he is and was a duly appointed agent authorized to enforce the laws of the City and the State of Kansas, and so acted under the color of law and in the scope of

his employment at all times relevant to this action. David Inkelaar is also the President of the FOP. He is sued in his individual capacity. As an officer of the FOP, he acted in concert with the other state-actor Defendants. He may be served with process at his place of employment at 455 N. Main, Wichita, Kansas 67201.

15.     Defendant Wendell Nicholson was a Captain for the WPD at all times relevant to this action. As such, he was a duly appointed agent, authorized to enforce the laws of the City and the State of Kansas, and so acted under the color of law and in the scope of his employment at all times relevant to this action. He is sued in his individual capacity. He may be served with process at his place of employment at 455 N. Main, Wichita, Kansas 67201.

16.     Defendant Kevin Kochenderfer was a Captain for the WPD at all times relevant to this action, and was in charge of the WPD's SWAT Team. As such, he was a duly appointed agent, authorized to enforce the laws of the City and the State of Kansas, and so acted under the color of law and in the scope of his employment at all times relevant to this action. He is sued in his individual capacity. He may be served with process at his place of employment, Ascension Via Christi St. Joseph, at 3600 E. Harry, Wichita, Kansas 67218.

17.     Defendant Paul Zamorano is a police officer for the WPD. As such, he was and is a duly appointed agent authorized to enforce the laws of the City and the State of Kansas, and so acted under the color of law, and in the scope of his employment at all times relevant to this action. Mr. Zamorano is also the resident agent of the FOP and the union member assigned to liaison with Defendant Bezruki. He is sued in his individual capacity for the federal claims. He also acted in his capacity as an officer of the FOP and acted in concert with the other state-actor Defendants. He may be served with process at his place of employment at 455 N. Main, Wichita, Kansas 67201.

18.     Defendants Layton, Bezruki, Livingston, Kochenderfer, and Nicholson acted under

the color of law in their capacities as leaders and/or law-enforcement officers employed by the City. Defendants Inkelaar, Zamorano, and the FOP acted in concert with the state-actor Defendants under the color of law.

## FACTS RELEVANT TO ALL CLAIMS

### Officers Within the Wichita Police Department Exhibited Extremely Racist, Misogynistic, Violent, and Anti-Authority Behavior

19.     On December 20, 2020, a text thread occurred between former officer Justin Maxfield of the Sedgwick County Sheriff's Department, who was also a member of the WPD's joint SWAT team, and Defendant Kochenderfer. The date and content of the conversation was consistent with the ongoing investigation of former WPD officer Lee Froese's fatal shooting of a Hispanic male suspect.

20.     Former officer Froese was also involved in the fatal 2012 shooting of an unarmed black man, Marquez Smart, who was <u>shot five times in the back</u>. The City settled the civil case over Mr. Smart's shooting for $900,000.

21.     Based on the time stamp and conversation, it is apparent that Defendant Kochenderfer was communicating while physically in the Investigations Bureau office.

22.     The conversation began with Maxfield, who was fired in 2021 after being arrested for domestic-violence battery, stalking, and criminal damage to property, congratulating Defendant Kochenderfer for his job in defending Froese. Captain Kochenderfer then made the following comments, which pertained to the incident under investigation:

> "**Froese did good ... Cmd staff doesn't think so but I say 100%**"

> "Yes ... bennett [Sedgwick County District Attorney] didn't seem to concerned ... but I think he had a card game to get to ... lol"

> "Exactly. That's what I told him. His eyes matter .. .**fuck these dipshits.**"

"They don't like that we have guns ... fuck, who knows" (in response to question "what don't they like")

**"All of them" (in response to statement "And by "they" we mean Gordo")**

"Yep ... they hate police" (in response to statement "Gordo and the gordettos") [a derogatory remark aimed at Chief Gordon Ramsay and the executive staff plaintiffs.]

"You are sooo right Max .. and they hate us cuz they got picked on by us ... Lol" (in response to "Cause they never were ones ... hate us cause they ain't us boss")

"**Bastards**" (in response to "Hahahahaha well, maybe a lack of forethought on our part ... **fucking nerds always end up running the world**")

**"Fucking tool. Hes in Orlando!!" (In response to "Hahajajahhhah EXCELLENT WORK CHIEF!!!!! HahahahahHahH")**

23.     This thread also included a text from June 4, 2020, showing former Chief Gordon Ramsay standing next to a woman with a "Black Lives Matter" shirt, intending to depict that former Chief Ramsay stood with the Black Lives Matter movement and *not* the WPD.

24.     Just here, then, was evidence that a prominent, influential member of the WPD—Defendant Kochenderfer—was, while on duty, disparaging former Chief Ramsay, whom he called "Gordo," and painting him as an irresponsible traitor in the context of an ongoing investigation.

25.     Further, Defendant Kochenderfer expressly disparaged Plaintiffs—the "Gordettos"—as being somehow in league with former Chief Ramsay and apparently antagonistic to the interests of the WPD even though all Plaintiffs had served the department for nearly three decades.

26.     This thread was long-running. For example, on April 25, 2020, one of these messages depicted a conversation by Maxfield in reference to Officer Froese: "Good. Their Headhunting him. Its frustrating when people that have no business being supervisors are able to

target guys that are out there doing work." Maxfield then referenced Sergeant Krys Henderson as a "bitch" and another officer responded, "Unfortunately we have a culture of supervisors 'proving' themselves by trying to hammer people."

27.    Defendant Kochenderfer's behavior was completely improper for any work environment, let alone for a police department under fire for another fatal shooting.

28.    The fatal shootings in which former officer Froese were involved, and for which Defendant Kochenderfer was defending him, were obviously racially tinged. Lest there be any doubt, however, that Defendant Kochenderfer, and others in the WPD, as well as the Sheriff's Department, were motivated by racial hatred, their text threads were later discovered to contain the following:

[INTENTIONALLY LEFT BLANK]









Hey Wyatt Earp. How about saving some bad guys for us to deal with. Ronen, Thompson, Perry, and I are about to hit the street but don't feel too confident we will find anything good because you keep putting holes in all the good targets.

For the record, you three are the "Ultimate De-Escalators" on the team... each you not only descalated a SWAT call or soon to be a SWAT call, but permanently descalated people who needed permanent deescalation ... and I'm proud of you guys. I know that isn't PC to say and would be complained about on the WhatsApp but that doesn't make it less true

29.     Thus, in just these selected messages, one has law-enforcement officers, sworn to uphold the Constitution and protect the public, deploying the most offensive racial slurs, joking that no one cares about dead Muslims, mocking the George Floyd tragedy, and congratulating those who killed yet *another* unarmed civilian.

30.     This latter point refers to WPD officer Justin Rapp's 2017 shooting of an unarmed Andrew Finch in his doorway during a "swatting prank call." That is, Rapp shot an unarmed man, a father of two, who had been the *victim* of a prank call.

31.     The City settled the civil case over Mr. Finch's shooting for $5 million.

32.     Rapp later told a police supervisor that if he ever ran into Mr. Finch's mother, he would tell her to "get over the shooting because he had."

33.     In aggregate, all this describes sociopathic behavior that has no place amongst those who are paid by society to defend her citizens.

34.     Even further, given that Plaintiffs Salcido and Givens are people of color, such racial animus fostered an even more hostile work environment for them personally. They discussed with each other how hard it was to see the text messages from people they knew and worked side by side with in the department.

35.     Plaintiff Salcido suffered particular harm seeing the text messages that referenced Hispanic Americans as "stupid Mexicans," including one between WPD officer Chad Spain and Maxfield, which also expressed, ironically, anti-government sentiment via support of the Three Percenters.

36.     Plaintiffs, as long-tenured Deputy Chiefs, the executive staff in charge of a police department, sought to reform such violent, racist, misogynistic, and generally outrageous behavior within subcultures of the WPD, which was not just their job responsibility but their duty under the

law.

**Plaintiffs Sought to Make Much-Needed Reforms
But Defendants Resented Plaintiffs and Collectively Worked to Undermine Them**

37.     Collectively, as the WPD's three Deputy Chiefs, Plaintiffs made up the entire executive staff under former Chief Ramsay from 2016 to 2022.

38.     Plaintiffs attempted on numerous occasions to root out and deal with systemic issues of racism, sexism, and homophobia within the department's ranks, and to implement much-needed changes to create greater transparency, discipline, and accountability.

39.     Plaintiffs spoke many times with former Chief Ramsay about the unethical and inappropriate involvement of Defendants Bezruki and Layton in police-discipline cases. Defendants Bezruki and Layton knew this and resented Plaintiffs for it.

40.     Plaintiffs suffered harm to their well-earned public reputations, lost job opportunities, and endured emotional injuries because of Defendants' defamatory and retaliatory actions, as described herein.

**i.     Organized Defense of Repugnant Text Messages**

41.     As an initial example, Plaintiffs wanted to appropriately discipline those involved in the aforementioned hostile, wildly inappropriate text messaging.

42.     Defendants FOP, Inkelaar, and Zamorano interfered with their investigation by going to Defendant Bezruki and claiming the racist and violent texts were protected under the First Amendment.

43.     After the text messages were released to the media, Defendant Inkelaar and a couple SWAT-team members spread the rumor that Plaintiff Givens leaked the information, which was patently false. Deputy Chief Givens even signed an affidavit specifically addressing the rumor.

44.     As Human Resources Director, Defendant Bezruki interfered in the investigation

into the text messages and overrode Plaintiffs, parroting the FOP and saying the text messages were protected by the First Amendment.

45.     Former Chief Ramsay asked the City Manager, Defendant Layton, to keep Mr. Bezruki out of the investigation. Defendant Layton refused and instead tried to brush the text scandal under the rug, improperly working in tandem with Defendant Bezruki to override the authority of Mr. Ramsay and Plaintiffs.

46.     Further, Mr. Layton lied to the public and denied knowledge of the texting investigation despite WPD leadership personally informing him about the text messages and their repugnant content.

47.     Channel 12 News reported that Defendant Layton created a internal-review committee to examine the WPD's handling of that matter. Eight people sat on that committee, including Defendant Bezruki, despite the obvious conflict of interest. The subsequent public press release distributed by the City portrayed WPD executive staff as incompetent and excluded facts provided about Mr. Bezruki colluding with the Union to interfere with the investigation.

48.     Plaintiffs thereby became public scapegoats for the City in its efforts to avoid liability.

49.     Mr. Layton clearly knew about the racist and violent texts because he began pushing for the *Smart v. City of Wichita* case to settle. He realized how damaging the text messages could be to ongoing litigation because former officer Froese was involved in the texting scandal and sent the message praising SWAT members who killed people for killing those who needed "permanent de-escalation."

50.     Defendant City has a policy of retaliating against critics in an attempt to silence them.

ii.     **Organized Defense of Defendant Nicholson's Criminal Conduct**

51.     Former Chief Ramsay, with the advice and support of Plaintiffs, ordered an investigation into Defendant and former Captain Wendell Nicholson for releasing confidential information.

52.     Defendant Layton asked Mr. Ramsay to show favor and give a pass or "restart" in the ongoing criminal/administrative investigation into Defendant Nicholson. He wanted Captain Nicholson to be given a "break" so he could attend a top-level FBI school despite reservations by Mr. Ramsay and the Plaintiffs. Defendant Layton later asked former interim Chief Lemuel Moore, who replaced ex-Chief Ramsay, to give Defendant Nicholson a "restart" concerning the ongoing criminal/administrative investigation.

53.     Defendant Layton then brought in Defendant Livingston, who had retired, to replace Mr. Moore as interim Chief and cover up the criminal conduct of Defendant Nicholson.

54.     Defendant Bezruki demanded Plaintiff Pinkston rewrite Mr. Nicholson's evaluation *five* times before approving it, which was an exceptional demand that had not been made with regard to an employee other than Defendant Nicholson.

55.     Despite overwhelming evidence of misconduct by Mr. Nicholson, Defendant Livingston declared the allegations to be "unfounded."

56.     However, on March 24, 2023, the day after Defendant Nicholson was allowed to retire from the WPD, the Sedgwick County District Attorney charged Mr. Nicholson with **eight felonies** for computer crimes related to his releasing confidential information via text and emails from his phone. Defendant Nicholson entered a diversion agreement on May 23, 2023, admitting to the allegations.

57.     As part of the District Attorney's investigation, information from Mr. Nicholson's

phone was downloaded, which information included text messages between Defendants during the time periods wherein Defendants conspired together, as alleged herein. Plaintiffs believe those text messages will link Defendants Bezruki, Layton, Nicholson, Zamorano, Inkelaar, Kochenderfer, Livingston and possibly others in their concerted efforts against Plaintiffs.

### iii.    Organized Effort to Promote Officer Rapp

58.    Plaintiffs chose not to promote officer Rapp because of his aforementioned attitude and lack of empathy displayed after killing an unarmed man.

59.    Plaintiff Givens authored a "skip letter" explaining the basis for denying Mr. Rapp the promotion.

60.    After then-Chief Ramsay and Plaintiff Givens resigned, Defendants Layton and Bezruki chose to *promote* Mr. Rapp on June 25, 2022.

61.    After the public outcry subsequent to that promotion, Defendant Layton lied, blaming since-retired Deputy Chief Givens by saying he did not have a copy of the skip letter, even though the letter was contained in Mr. Rapp's personnel file and easily accessible to Defendant Layton as the City Manager.

62.    Plaintiff Salcido was accused of, and investigated for, leaking the skip letter, which he did not do. Defendant Nicholson is believed to have leaked the skip letter in a concerted effort to publicly humiliate Plaintiffs.

### iv.    Defendant Layton's Attempted Supplanting of Federal Funds

63.    The City received $875,000 in federal grant money to hire more police officers. Defendant Layton attempted to illegally divert the $875,000 in funds designated for the police department by reducing the budget for the WPD by the same amount, thereby violating federal law.

64.     Plaintiffs complained that Defendant Layton's actions were improper and illegal. As a result of Plaintiffs' complaints regarding the supplanting of funds, Defendant Layton reversed course and the City used the funds as designated.

65.     Defendant Layton resented Plaintiffs for calling out his illegal attempt to supplant the funds.

**v.      Reversal of Termination by Defendant Bezruki**

66.     In 2017, a WPD officer involved in an auto collision left the scene of the accident. The WPD investigated the incident and, at the conclusion of the investigation, former Chief Ramsay terminated the officer's employment.

67.     When it became clear the officer would be terminated, Defendant Livingston, while acting as Deputy Chief, conspired with Defendants FOP and Bezruki to rehire the officer after Chief Ramsay terminated her.

68.     Mr. Bezruki reinstated the officer *four days* after she was terminated, thereby reversing the discipline imposed and undermining leadership.

69.     On numerous occasions, Defendant Bezruki inappropriately interfered with, and overturned, discipline imposed by and recommended by Plaintiffs in an effort to undermine Plaintiffs' efforts at reforms to address systemic racism, sexism and homophobia in the WPD. As described in greater detail below, Mr. Bezruki enjoyed an inappropriately close relationship the FOP, including Defendants Inkelaar and Zamorano.

**vi.     Reversal of Discipline for Sergeant Maurice Mitchell**

70.     WPD Sgt. Maurice Mitchell "slapped the ass" of a WPD female officer when she was restrained during a training exercise.

71.     Due to a conflict of interest for the City's legal department, the misdemeanor was

presented to an outside agency, which charged Mitchell with battery.

72.     The City allowed Mitchell to enter a diversion agreement and avoid prosecution after he provided "letters of apology, made a charitable cash donation, and completed sexual harassment training."

73.     During the internal investigation, Mitchell admitted his wrongdoing.

74.     Upon the recommendation of Plaintiff Givens, and agreements from Plaintiffs Salcido and Pinkston, former Chief Ramsay demoted Mitchell to officer, a non-supervisory position.

75.     Defendant FOP appealed the demotion.

76.     Plaintiffs, as executive leadership, attempted to mediate the matter and offered to allow Mitchell to retest after a year.

77.     Defendant Bezruki interfered in the investigation.

78.     Mr. Bezruki was not interested in how women felt about the sexual harassment and removed the senior female Human Resources specialist/diversity manager from the case and excluded her from meetings on the topic.

79.     Moreover, Defendant Bezruki dismissed the opinion of Deputy Chief Givens, the only female on the executive staff of the WPD, and thereby excluded the only female left on a sexual-harassment case involving the slapping of a female officer's buttocks while she was physically restrained during training.

80.     Defendant Bezruki, as Human Resources Director, repeated on at least three occasions that not only was "slapping the ass" of a female officer not a sexual battery but was not even sexual harassment.

81.     Moreover, while leadership attempted to mediate the matter, Mr. Bezruki,

unilaterally, or with the approval of Defendant Layton, reinstated Mitchell as sergeant and thereby reversed the decision of the executive staff.

82.     By overriding the previously imposed discipline, and circumventing the ongoing mediation, Defendant Bezruki again intentionally undermined the executive staff in the eyes of the officers and created additional discord within the WPD.

83.     Mr. Bezruki's reversal of Mitchell's discipline was also contemporaneous with Plaintiff Salcido reporting a receipt of gifts from the FOP by Defendant Bezruki to the City after receiving a report thereof from an employee.

84.     Defendant Bezruki's reversals sent a clear message to the executive staff that Mr. Bezruki controlled discipline over the officers—and the FOP controlled Mr. Bezruki.

85.     In August 2021, Plaintiff Givens invited Defendant Bezruki to attend a community meeting, which included representatives of the NAACP, Ministerial League, Racial Profiling Advisory Board, and other concerned citizens, to discuss the FOP contract negotiations and the discipline process for WPD officers. Mr. Bezruki had executive staff accept the meeting, then simply did not show up, in an effort to publicly embarrass Ms. Givens in the eyes of the community.

### vii.    Interference in Police-Shooting Investigations

86.     Deputy Chiefs Salcido and Pinkston attempted to implement much-needed change in the way WPD conducted police-shooting investigations. The FOP vigorously objected to these changes and took steps to prevent them.

87.     In late October of 2020, following the officer-involved shooting documented as WPD Case number 20C067015, wherein five officers discharged their weapons, FOP representatives can be observed in the AXON videos interfering with the focus officers.

88.     The FOP's interference occurred not only at the scene but also involved proactive attempts to contact officers in the interview rooms.

89.     The FOP President, Defendant Inkelaar, claimed the Union paid for the attorney and, therefore, its representatives were entitled to be present in the room during the criminal investigation while detectives interviewed the shooting officer. Further, the FOP unlawfully hindered and obstructed the investigation into the police shooting by refusing to turn over notes for the case and arguing the notes were Union work product and thus protected.

90.     Plaintiff Salcido contacted District Attorney Marc Bennett to discuss possible charges for FOP members interfering in any future cases or for not turning in notes for discovery.

91.     On December 20, 2020, a WPD officer shot a Hispanic, male, bank-robbery suspect at 13th and Webb. During the subsequent investigation, Defendant Inkelaar and Vice President Asmussen again demanded to be present with attorney Jim Pratt, whom the FOP retained to represent the involved officer.

92.     Deputy Chief Salcido informed them the FOP would have to file a PERB violation and take it up then but they would not be allowed into the room with the officer and his attorney.

93.     Deputy Chief Salcido also contacted District Attorney Marc Bennett regarding the FOP's ongoing conduct, as described.

94.     Plaintiffs' efforts to ensure the integrity of officer-involved-shooting investigations created a rift with the FOP, which filed a grievance over this change.

95.     Defendant Inkelaar also sent emails to Defendant Layton in July 2021 and met with him in an effort to interfere with WPD discipline and remove its executive leadership. In an email to Mr. Layton in July 2021, Mr. Inkelaar said the following, in pertinent part:

> I am following up on the email I sent you last week asking for a meeting. **I wanted to follow the chain of command**

**and give you an opportunity to help us resolve some issues we are having with Chief Ramsay and the Command Staff.** If you are not willing to meet, I will address my concerns with the city council and the media, if necessary. (Emphasis added.)

viii.    **The Gang List**

96.    The WPD's so-called Gang List predominantly comprised people of color, especially African-American and Latino men. The Gang List is the subject of at least one currently pending discrimination lawsuit (*Progeny et al v City of Wichita*, 21 CV 1100), in which Deputy Chiefs Salcido, Pinkston, and Givens, were expected to be called to testify because of their effort to reform the Gang List. Givens and Salcido have been subpoenaed and since testified in that case.

97.    Plaintiffs recognized the immense problems with the list, especially regarding embedded racial issues, lack of transparency, and the unregulated placement of individuals onto the list. They wanted to implement a due-process procedure to remove adults from the list, require notification for parents of children placed on the list, and add intervention for juveniles.

98.    Deputy Chief Salcido proposed a five-member panel comprising three officers and two citizens in this regard, with the citizens being, respectively, a member of the African-American community and Latino community, as both groups were overrepresented on the Gang List.

99.    The City, through its agents, including Defendants Layton, Bezruki, Inkelaar, Zamorano, Nicholson, Kochenderfer, Livingston, and the FOP, reacted with hostility and resentment towards such attempts at protecting the rights of African and Hispanic Americans, fostering a hostile work environment for Plaintiffs and conspiring to remove them from their positions.


**Mr. Bezruki Enjoyed an Inappropriately Close Relationship with the FOP**

100.     Mr. Bezruki accepted gifts of alcohol and dinners from the FOP, specifically from Defendant Zamorano, in exchange for favorable treatment of the FOP in contract negotiations and officer discipline. As a result, Defendant Bezruki improperly stymied and undermined Plaintiffs' authority while also rewarding Defendant FOP with an inordinately lucrative City contract.

101.     When Plaintiffs made decisions with which the FOP disagreed, the FOP leadership, including Defendants Inkelaar and Zamorano, ran to Defendant Bezruki, and many times Defendant Layton would arbitrarily overturn Plaintiffs' decisions without investigation or basis in fact.

102.     Generally, Mr. Bezruki stymied and undermined Plaintiffs' authority because Plaintiffs wanted to *root out corruption* and *clean up the WPD* while the FOP wanted to maintain, to its own benefit but at the expense of the City, the status quo, including as to preferential treatment for unduly violent, undisciplined, and/or corrupt officers.

103.     Despite Defendant Bezruki's inappropriate relationship with the FOP being brought to Mr. Layton's attention, Mr. Layton did not overrule Mr. Bezruki when he arbitrarily overturned grievances or when Mr. Bezruki negotiated with the FOP the most favorable contract, by far, of any city employee organization.

104.     Former Chief Ramsay asked Mr. Layton on numerous occasions to keep Defendant Bezruki out of police discipline until it reached his level of contractual involvement; Defendant Layton refused to do so.

105.     The minds of Mr. Bezruki and Mr. Layton met, numerous times, on the objective of harming Plaintiffs' careers while discrediting and defaming them. Defendants and Bezruki and Layton were, in effect, the spearheads of a classic good-old-boy network, which viewed Plaintiffs antagonistically. However, as described herein, all Defendants participated in this conspiracy to

injure Plaintiffs.

106.     In July of 2021, Deputy Chief Salcido received an ethics complaint regarding Defendant Bezruki's aforementioned acceptance of free dinners, bottles of alcohol, and gifts from the FOP. As required, Deputy Chief Salcido forwarded the complaint to Assistant City Manager Donte Martin who, after a several-month delay, met with the complainant and Mr. Salcido.

107.     Defendant Inkelaar also met with Defendant Layton in July 2021 to give Mr. Layton "an opportunity to resolve some issues" regarding former Chief Ramsay and Plaintiffs, which meeting was contemporaneous with the ethics complaint against Mr. Bezruki. Defendant Inkelaar, with the support of Defendants FOP and Zamorano, met with Defendant Layton in an attempt to, in particular, get Plaintiff Salcido to suppress the report of Mr. Bezruki's illegal relationship with the FOP.

108.     On December 7, 2021, Plaintiff Salcido spoke with the FBI's Kansas City office regarding the value of preferential FOP contracts and Mr. Bezruki receiving free dinners and gifts, including alcohol, from the FOP, in violation of the law. The FBI opened an investigation into Mr. Bezruki and the FOP.

109.     In retaliation for Plaintiffs' warning about the inappropriate relationship between the FOP and Defendant Bezruki, as well as their positions on sexual harassment, the racist and violent texts, and their refusal to give WPD officers special treatment as demanded by the FOP, Defendants took retaliatory actions, including, but not limited to, withholding already approved pay raises for Plaintiffs Salcido and Pinkston for approximately six months, and passing over Salcido and Pinkston for promotion to Interim Police Chief.

### Human-Resources-Specialist Information About Defendant Bezruki

110.     Even further, a former Human Resources specialist, who worked for the City from

2012 to 2016, described to Plaintiff Salcido an event where a male officer inappropriately took a female officer into the bathroom of a bar: Professional Standards investigated the incident; recommendations were made for discipline and the executive staff concurred; the investigation was sent to Mr. Bezruki for him to review; according to the specialist, the file languished on Defendant Bezruki's desk for weeks, to the point the Professional Standards Board called to inquire about it; the specialist spoke to Defendant Bezruki, who instructed her to review the file and give him her opinion, which she did; she recommended he sign off on the memo as requested; Mr. Bezruki then provided his signature without reviewing the memo and then discussed it with Defendant Layton, seeking his approval as well; shortly thereafter, the FOP representatives took Defendant Bezruki to lunch; and, upon returning from that lunch, Mr. Bezruki reversed his decision concerning the employee discipline.

111.    The former Human Resources specialist has stated that there were many other instances like this. She claims that these lunches with the FOP occurred often and also notes that Mr. Bezruki did not give other employee organizations the same access or opportunity to meet with him.

112.    Finally, the former specialist retains a "strong suspicion" that Defendants Layton and Bezruki had a former relationship with each other before Mr. Layton hired Mr. Bezruki. She remembers the manner in which Defendant Bezruki was hired seemed unusually quick and she thought it strange that "we didn't have multiple people." [applicants].

113.    The specialist also described instances where Defendants Layton and Bezruki gave individuals unlawful preferential treatment in the hiring process. She further described Mr. Bezruki devaluing and objectifying women when he stated a woman was hired because "she was easy on the eyes."

**Defendants Conspired to, and Did,
Defame, Undermine, and Retaliate Against Plaintiffs**

114.    As described, albeit it only in part, Defendants systematically undermined Plaintiffs' efforts to root out corruption, racism, misogyny, and undue violence in the WPD. Broadly, as expressly described or alluded to, Defendants' improper influence was exercised via Defendants Layton and Bezruki through their expansive powers within the City, with Mr. Bezruki working particularly closely with the FOP, including Defendants Inkelaar and Zamorano, and by the other Defendants within the WPD proper.

**i.    Defendants Conspired to Harm Plaintiffs in Their Careers**

115.    Defendants conspired to drive out Plaintiffs with the objective of installing handpicked replacements, who would be more pliable and willing to look the other way regarding the many serious problems described above.

116.    Deputy Chief Givens retired early due to the hostile work environment created by Defendants. Ms. Givens endured a concerted effort to defame her via false press releases, a rigged survey, and rumors. She suffered harm to her reputation that made it difficult to find other employment. Ms. Givens has witnessed a noticeable decline in the number of contacts from the community since the campaign against her and the other Plaintiffs, with far fewer people reaching out to her as her standing in the community has been diminished. But for the actions of Defendants in creating the hostile work environment as set forth herein, Plaintiff Givens would not have retired and has therefore suffered injury in the form of lost pay.

117.    When Mr. Givens was forced to retire, Captain Lemuel Moore was designated by Defendant Layton to replace her as acting Deputy Chief. After Mr. Moore had been acting Deputy Chief for approximately a month, he was appointed to be the interim Chief, over both Plaintiffs Salcido and Pinkston, who had been Deputy Chiefs for approximately six years at that point.

118.    Remarkably, Mr. Layton *did* interview Defendant Nicholson—he of the eight felony charges—for the WPD Chief position.

119.    When Mr. Moore resigned as the interim Chief, Defendant Layton brought in Defendant Livingston to replace Mr. Moore as the interim Chief, thereby passing over Plaintiffs Salcido and Pinkston for a second time, despite their possessing considerably more experience.

120.    While seeking a new WPD Chief, Defendant Layton told at least one applicant he wanted them to come in and discipline or terminate Plaintiffs Salcido and Pinkston. Defendant Livingston was brought in as interim Chief to replace Mr. Ramsay, clear Defendant Nicholson, and discipline Plaintiffs Pinkston and Salcido. Defendant Livingston knew this and thereafter isolated Plaintiffs Salcido and Pinkston in their job duties by improperly depriving them of their responsibilities, leaving them out of meetings, eliminating their involvement in decisions normally made by Deputy Chiefs, and minimizing their ability to effectively do their jobs.

121.    Mr. Layton had also marginalized and tried to force out Plaintiffs Pinkston and Salcido by giving assignments to the remaining interim Deputy Chief after Chief Ramsay resigned, thereby isolating them in their job duties. The role of Deputy Chiefs is to manage the three respective divisions within the WPD. However, in selecting the replacement for Mr. Moore once he was promoted to interim Chief, Deputy Chiefs Pinkston and Salcido were not allowed to sit in on interviews in that regard, which interviews had always been a responsibility and duty of the Deputy Chiefs. Thereby, Plaintiffs Pinkston and Salcido were ostracized and diminished relative to what should have been their proper place within the WPD's executive ranks.

122.    Defendant Layton, as the City Manager, discriminated against Plaintiffs in their careers because they sought to *uphold* the law, and did so with the express or tacit support of all the other Defendants. Defendant Layton's desire to see Plaintiffs disciplined and/or terminated

constituted retaliation for their association with former Chief Ramsay and their attempts to address corruption and unlawful discrimination within the WPD and City.

123.    While still a Deputy Chief, Mr. Pinkston experienced retaliatory actions including withholding of pay, removal of job duties, and exclusion from meetings. Chief Pinkston suffered a concerted effort to defame him and the other Plaintiffs with false press releases, a rigged survey, and rumors. He suffered harm to his reputation that made it difficult to find other employment and eventually took another job with lower pay.

124.    This hostility was fostered by Defendants in retaliation for many issues including, but not limited to: Mr. Pinkston's championing reforms to ensure racial equality and protection of constitutional rights for those on the Gang List; reformation of the investigative procedures for officer-involved shootings; calling out of illegal activity in the form of Defendant Layton's attempt(s) to supplant federal funds; speaking with media about racist text messages; and defending himself, the other Plaintiffs, and former Chief Ramsay regarding discipline for those text messages.

125.    Defendants also compelled Plaintiffs to undertake tasks well outside of their job duties, which, generally, wasted their time and demeaned them.

ii.    **The Rigged Survey**

126.    Defendants, including, but not limited to, Defendants Nicholson and Kochenderfer, selectively released false information, to be published in the *Wichita Eagle*, to reporter Michael Staviola, in or about August or September of 2021.

127.    This information derived from a "survey," conducted by Dr. Delores Craig-Moreland at Wichita State University and the WPD, which was circulated among select officers by Defendants Nicholson and Kochenderfer—despite instructions not to do so and knowledge that

the security of the survey was compromised. Plaintiff Pinkston twice instructed Defendants Nicholson and Kochenderfer not to conduct the survey.

128.    Defendants Nicholson and Kochenderfer self-selected members to complete the survey so as to produce illusory results. Defendants sought such compromised results to smear the names and reputations of Plaintiffs.

129.    Dr. Craig-Moreland contacted former Chief Ramsay on November 10, 2021, stating the following:

> I believe we urgently need a telephone conversation. It has come to my attention the officer survey security was compromised. There is a rumor the surveys were left unsecured and copied. **I know I need to withdraw all information from the officer surveys because I no longer have confidence the set of responses was valid and genuine.**

130.    Defendants used this compromised survey to defame, discredit, and undermine the authority and reputation of Plaintiffs, and Chief Ramsay, despite the concerns raised by Dr. Craig-Moreland and WPD executive staff. Examples of the rigged survey were published in a *Wichita Eagle* Article and included the following comments: "Top police leadership is more concerned with public image and assigning blame than addressing the issues."; and "Officers in the focus group said efforts to diversify the department have led to the hiring of under-qualified people who don't stay long and who may jeopardize the safety for all officers."

131.    The release of the rigged survey was contemporaneous with Plaintiff Salcido's report to the FBI regarding Defendant Bezruki; Bezruki's interference with the racist text investigation; Plaintiff Givens' report to the City and KHRC; and an email from the FOP President, Defendant Inkelaar, to Defendant Layton asking for his help in dealing with former Chief Ramsay and the "command staff," as well as other issues addressed herein. As such, all Defendants were

implicated in this effort to defame and discredit the "command staff"—i.e., Plaintiffs.

iii.   **Whistle-Blower Retaliation and Further Defamation**

    a.   **Sexual Harassment**

132.    In response to, as described, Defendant Bezruki's statements that slapping the bottom of a woman was *not* sexual harassment, Plaintiff Givens filed a grievance with the City against Mr. Bezruki in, or about, August 2021.

133.    Mr. Bezruki refused to cooperate with Captain Blake Mumma, whom Assistant City Manager Donte Martin appointed to investigate the issue, opened as Internal Administration Investigation 21PSB-4578.

134.    Ms. Givens inquired many times regarding the status of the investigation between September 2021 and December 2021, only to learn that Defendant Bezruki still had not been questioned. It became obvious that Mr. Bezruki was refusing to cooperate and was stalling and obstructing the investigation.

135.    Remarkably, Defendant Bezruki was the "Ethics Officer" for the City and responsible for processing complaints. As such, Mr. Bezruki abused his position and violated the Wichita Code of Ethics by stalling and refusing to cooperate with the investigation into his actions, despite Assistant City Manager Donte Martin ordering the investigation. The City failed to force Mr. Bezruki's cooperation and was thereby complicit in his violating the Code of Ethics and creating a hostile work environment for Plaintiff Givens and every other woman working for the City.

136.    On September 2, 2021, Defendant Bezruki directed Human Resources specialist Susan Leiker to call former Deputy Chief Givens and ask if she had started a "petition for females not to work with Sergeant Mitchell," a manifestation of a rumor that Defendant Bezruki fostered

to harm Plaintiff Givens.

137.   Mr. Bezruki and other city employees made this allegation in front of at least Sergeant Brunsheen and Defendants Zamorano and Inkelaar, all members and officers of the FOP. Defendant Inkelaar further spread the rumor about Givens at the Union executive board meeting.

138.   Mr. Bezruki initiated the rumor as retaliation for Ms. Givens' filing a complaint about him for sexual harassment regarding his comments that slapping a woman on the buttocks is not sexual harassment.

139.   Defendant Bezruki wanted to discredit Plaintiff Givens as the highest-ranking female of the more than 100 female officers in WPD, and in the community generally. Former Deputy Chief Givens filed a complaint with the Kansas Human Rights Commission as a result.

140.   A "Right to Sue" letter was issued by the EEOC on December 15, 2022.

141.   As stated, Plaintiff Givens retired and left her employment with the WPD rather than continue subjecting herself to continued discrimination and a hostile work environment.

142.   Shortly thereafter, Defendant Bezruki, as described, reversed the demotion of Sgt. Mitchell.

**b.   Proper Denial of a Personal Car for Mr. Inkelaar**

143.   On February 4, 2022, WPD officer and FOP President Defendant Inkelaar claimed retaliation by a Lieutenant Bartel because Mr. Inkelaar had to share a city-owned vehicle with two other officers rather than being given a vehicle for his sole use when there was an unassigned car.

144.   Plaintiff Salcido investigated the allegation and denied the grievance after finding Bartel's approach was consistent with past practice and aligned with the best interest of the City and its taxpayers.

145.   The FOP then appealed Deputy Chief Salcido's denial of the grievance. Former

Chief Ramsay also denied Mr. Inkelaar's appeal.

146.     The FOP then appealed to the Human Resources department, which again reversed the decision of leadership, this time in favor of the President of the FOP, who wanted a car all to himself.

147.     Importantly, Deputy Chief Salcido conducted the initial meeting with Defendant Inkelaar regarding the grievance in an interview room, where meetings are recorded for the sake of transparency. Mr. Inkelaar and the FOP went straight to Defendant Bezruki to complain.

148.     <u>Mr. Bezruki immediately forbid recording meetings with the FOP</u>.

149.     Then, on April 21, 2022, Defendant Inkelaar issued a press release for the Union regarding the discipline of officers in the racist texting scandal. Channel 12 reported "the FOP denies any involvement in the discipline of the officers and suggests that some city leaders may have known about the texts longer than they've admitted to."  Defendant Inkelaar is quoted as stating the following: "[W]e [Fraternal Order of Police Lodge #5] can no longer sit in silence as the City of Wichita Department and the Wichita Police Department try to move the blame for their poor leadership and decision-making to the FOP."

**iv.     Retaliation for Channel 12 Interview in Support of Former Chief Ramsay**

150.     On May 18, 2022, Plaintiffs Salcido and Pinkston were interviewed by reporter Hailey Tucker, of television station KWCH Channel 12, in an aired story titled, "Wichita Police Leaders Back Former Chief, Echo Concerns About Internal Review."

151.     Plaintiffs Pinkston and Salcido were not in uniform and the interview was not part of their job duties. Plaintiffs Pinkston and Salcido, as well as Ms. Givens, were credited with a number of positions and quotes, in defense of former Chief Ramsay and critical of, in particular Defendants Layton and Bezruki, including, but far from limited to:

a.  Plaintiffs spoke out in defense of former Chief Ramsay, who had sent a letter to the Wichita City Council warning about the internal investigation into the racist text messages and Defendant Bezruki's involvement. According to KWCH, "The letter talks about the recent case regarding the Wichita Police officers and Sedgwick County Sheriff's deputies that sent racist, homophobic, and sexist text messages throughout the summer of 2021." Chief Ramsay states in the letter, "The real purpose is to distract attention from the inappropriate interference of the Human Resources Director in the disciplinary system of the WPD and to deflect it onto the very people who brought forward significant ethical and operational concerns."; and

b.  Plaintiffs Salcido and Pinkston expressed their support for Chief Ramsay and his publication of the letter refuting the position of the City regarding the racist text messages and Defendant Bezruki's role in that regard.

152.  In retaliation for this interview, Defendants defamed and retaliated and created a hostile work environment for Plaintiffs Salcido and Pinkston.

**v.   Disparate Treatment of Deputy Chief Salcido**

153.  <u>Deputy Chief Salcido, who is Hispanic, was treated differently from Deputy Chief Pinkston, who is white, in that the disciplining of the officers for the racist texts was specifically brought up as a negative in his performance evaluation. In contrast, it was not specifically addressed at all in Deputy Chief Pinkston's evaluation from the same time period.</u>

154.  Deputy Chief Salcido has also been subjected to several retaliatory investigations, including the following: On April 12, 2022, Plaintiff Salcido informed Assistant City Manager Donte Martin by email that he had filed a whistleblower complaint with the Department of Justice; shortly thereafter, KWCH made a KORA request for emails between Plaintiff Salcido and Mr. Martin; on May 31, 2022, former interim Chief Moore told Mr. Salcido that he was under investigation for interfering with a Professional Standards investigation; and Plaintiff Salcido was accused of, and investigated for, leaking the aforementioned Rapp skip letter, which he did not do— Defendant Nicholson is believed to have leaked the skip letter in yet another concerted effort to publicly humiliate Plaintiff Salcido and the other Deputy Chiefs. Deputy Chief Salcido was also

questioned regarding whether he orchestrated the cancellation of WSU's Christian Brewer's presentation at a law-enforcement conference, which he also did not do.

155.    Defendant Inkelaar further initiated false complaints about Plaintiff Salcido creating a "hostile work environment" in the Gang Unit because of Mr. Salcido's efforts to address and reform systemic racism in the Gang Unit and via the so-called Gang List.

156.    As a result of his speaking out, Deputy Chief Salcido has experienced retaliatory actions, including withholding of pay; removal of job duties; exclusion from meetings; a concerted effort to defame him and the other Plaintiffs with false press releases, a rigged survey, and rumors; and other retaliatory actions designed to minimize Mr. Salcido's role in the WPD and force him to resign. As a result of the retaliatory acts, as alleged herein, taken by Defendants, Deputy Chief Salcido has been passed over for promotion, lost job opportunities in other cities (including Derby, Kansas and Austin, Texas), and suffered harm to his reputation as a police officer.

## COUNT ONE:
### First Amendment Violation – Retaliation—Freedom of Association

157.    Plaintiffs incorporate by reference all other allegations set forth in the foregoing paragraphs as though reiterated herein.

158.    The First Amendment of the United States Constitution protects the right to associate with individuals and protects individuals from retaliation for exercising their First Amendment rights.

159.    Defendants' actions, as described herein, amounted to retaliation against Plaintiffs Salcido, Givens, and Pinkston for their association with, as his Deputy Chiefs, former Chief Gordon Ramsay, and was a motivating reason for Defendants' efforts to harm the reputations and employment of Plaintiffs.

160.    Defendants' acts would chill a person of ordinary firmness from continuing to

engage in an activity.

161.    Plaintiffs bring these claims against Defendants City, Layton, Bezruki, Livingston, Kochenderfer, Nicholson, Inkelaar, Zamorano, and the FOP.

162.    As a result of Defendants' actions, Plaintiffs suffered injury and damages, including economic and non-economic damages.

**COUNT TWO:**
**First Amendment Violation—Retaliation and Hostile Work Environment**

163.    Plaintiffs incorporate by reference all other allegations set forth in the foregoing paragraphs as though reiterated herein.

164.    The First Amendment of the United States Constitution protects public employees, such as Plaintiffs, from retaliation for exercising their right to free and protected speech.

165.    The content, form, and context of Plaintiffs' protected speech addressed matters of clear public concern.

166.    More specifically, Plaintiffs' allegations of misconduct, malfeasance in office, incompetence, and neglect of duty on behalf of the Defendants concerns issues that squarely implicate the interests of the public.

167.    When balancing the First Amendment rights of Plaintiffs with the Defendants' interest in providing effective public services, there does not exist a countervailing interest of the Defendants to control the operation of a workplace by interfering with Plaintiffs' rights to free speech.

168.    The facts herein describe a situation that was not an ordinary workplace dispute. Plaintiffs spoke out regarding governmental misconduct and their speech warrants protection under the First Amendment.

169.    Plaintiffs' interest in commenting on the issues outweighs the potential disruptive

effect of that speech.

170.    Defendants subjected Plaintiffs to a campaign of public harassment and ridicule, in addition to adverse employment actions, in retaliation for exercising their First Amendment rights.

171.    The protected free speech of Plaintiffs was a motivating factor in the adverse employment actions and harassment taken by Defendants.

172.    Plaintiffs' efforts to enact change and create transparency in the WPD by raising awareness of the problems like racism, sexism, homophobia, and violence within subcultures of the WPD were matters of public concern that would actually promote efficiency in the City's provision of services.

173.    As a result of raising these issues of public concern, Defendants retaliated against Plaintiffs by conspiring to isolate them in their official capacities and to remove them from their official positions.

174.    Defendant City has a custom, or unofficial policy, of retaliating against employees who speak out against City corruption, as evidenced by the actions taken against Plaintiffs by City leaders like Defendants (City Manager) Layton and (Human Resources Director) Bezruki, who have final policymaking authority.

175.    Plaintiffs bring these claims against Defendants City, Layton, Bezruki, Livingston, Kochenderfer, Nicholson, Inkelaar, Zamorano, and the FOP.

176.    Plaintiffs suffered injury and damages, including economic and non-economic damages.

## COUNT THREE:
## Fourteenth Amendment Violation – Due Process

177.    Plaintiffs incorporate by reference all other allegations set forth in the foregoing paragraphs as though reiterated herein.

178.     Defendants acted under the color of law.

179.     Plaintiffs, as public employees, had/have a liberty interest in their reputations in the context of their employment.

180.     Plaintiffs had/have a liberty interest in their positions as Deputy Chiefs of the WPD.

181.     Defendants made defamatory and retaliatory comments regarding Plaintiffs and took retaliatory actions towards Plaintiffs, as described herein.

182.     Plaintiff Givens was entitled to, and denied, due process for her claims against Defendant Bezruki.

183.     Plaintiffs were entitled to due process regarding potential discipline for their positions with the City and were denied the same by the actions of Defendants City, Layton, Bezruki, and Livingston.

184.     As a result of the policy, Plaintiffs suffered injury and damages, including emotional pain and suffering.

### COUNT FOUR:
### Fourteenth Amendment Violation – Equal Protection

185.     Plaintiffs incorporate by reference all other allegations set forth in the foregoing paragraphs as though reiterated herein.

186.     Plaintiffs Salcido and Givens are members of protected classes: Salcido is Hispanic and Givens is an African-American woman.

187.     Plaintiffs Salcido and Givens were treated differently from similarly situated people based on Salcido's race and Givens' race, gender, and sex.

188.     Plaintiff Givens was treated differently from Deputy Chiefs Salcido and Pinkston, as Defendant Bezruki excluded her from the issues and investigation regarding Sgt. Mitchell, described above, based on her gender and sex and because she filed a complaint against Defendant

Bezruki for sexual harassment.

189.　Deputy Chief Salcido was treated differently from Deputy Chief Pinkston, who is white, in his performance review after the text-messaging scandal because of his race; there is no other reasonable explanation as to why the text-messaging scandal would be mentioned negatively in Plaintiff Salcido's review and not in Plaintiff Pinkston's.

190.　The City allowed a culture of racism and sexism to exist, with its leaders deliberately indifferent in this regard, as evidenced by their refusal to appropriately discipline the officers involved in the racist and misogynistic texting scandal.

191.　Plaintiff Givens and Salcido bring these claims against Defendants City, Layton, and Bezruki, and Livingston.

192.　As a result of the differential treatment described herein, Plaintiffs Givens and Salcido suffered economic and non-economic damages.

## COUNT FIVE:
## Conspiracy to Violate the First and Fourteenth Amendments

193.　Plaintiffs incorporate by reference all other allegations set forth in the foregoing paragraphs as though reiterated herein.

194.　Defendants worked in concert to violate the rights of Plaintiffs, in violation of 42 U.S.C. §1983.

195.　Defendants participated by words and actions, and agreed or had a meeting of the minds to defame, punish, and drive out Plaintiffs from their positions as the executive staff of the WPD, in violation of Plaintiffs' First and Fourteenth Amendment Rights.

196.　As a result of that conspiracy, Plaintiffs suffered injuries to their reputations and employment, for which they sustained economic and non-economic damages.

## COUNT SIX:

**Outrageous Conduct**

197.     Plaintiffs incorporate by reference all other allegations set forth in the foregoing paragraphs as though reiterated herein.

198.     Defendants' actions injured Plaintiffs by causing emotional distress through Defendants' outrageous and unlawful acts of wrongfully conspiring to harm, and actually harming, Plaintiffs' reputations and employment in retaliation for addressing matters of public concern.

199.     The actions of Defendants were intentional or recklessly taken.

200.     The actions of all Defendants in conspiring to harm Plaintiffs, as described herein, constituted outrageous conduct.

201.     Defendant City is liable, as a matter of law, for the actions of Defendants in injuring Plaintiffs while acting in the scope of their employment or office, pursuant to the Kansas Tort Claims Act, K.S.A. § 75-6103.

202.     As a direct and proximate result of the actions of all the Defendants, Plaintiffs suffered injury and damages, including severe and extreme emotional pain and suffering, and economic damages.

**COUNT SEVEN:**
**Defamation**

203.     Plaintiffs incorporate by reference all other allegations set forth in the foregoing paragraphs as though reiterated herein.

204.     Defendants made false statements about Plaintiffs, which false statements exposed Plaintiffs to public ridicule, hatred, and contempt, and deprived them of public confidence and social acceptance.

205.     The false statements made by Defendants were made with reckless disregard for the truth, with actual evil mindedness, and intent to injure.

206.     As a result of the false statements made by Defendants, Plaintiffs suffered harm to their reputations, for which they are entitled to compensation for both economic and non-economic damages.

207.     Defendants' intentional misconduct in defaming and undermining Plaintiffs damaged their employment and career opportunities, including advancement within the WPD and their post-WPD employment opportunities.

208.     Plaintiffs suffered damages as a direct or proximate cause of Defendants' defamation.

## COUNT EIGHT:
### Civil Conspiracy Under Kansas Law

209.     Plaintiffs incorporate by reference all other allegations set forth in the foregoing paragraphs as though reiterated herein.

210.     As described above, Defendants conspired against Plaintiffs, with the objective of defaming Plaintiffs and depriving them of their good names and reputations, including by interfering with Plaintiffs' employment as the executive staff of the WPD.

211.     As described above, Defendants, under the color of law, actively conspired to unlawfully defame and undermine Plaintiffs, while also impinging upon their fundamental constitutional rights, including through concerted, ongoing retaliation.

212.     The minds of Defendants met on these wrongful objectives.

213.     Defendants took multiple actions to advance these unlawful objectives, including through words and actions, both public and private.

214.     Plaintiffs suffered damages as a proximate result thereof.

## COUNT NINE:
### Violation of Title VII

215.    Plaintiff Wanda Givens incorporates by reference all other allegations set forth in the foregoing paragraphs as though reiterated herein.

216.    Plaintiffs Salcido and Pinkston specifically do not join in any Title VII claims herein at this time, as they are still waiting on their respective "Right to Sue" letters after filing complaints with the EEOC. Plaintiffs Salcido and Pinkston specifically reserve their rights to bring claims pursuant to Title VII.

217.    Plaintiff Wanda Givens received a "Right to Sue" letter after filing her complaint with Kansas Human Rights Commission and EEOC.

218.    Defendant City, as Plaintiff Givens' employer, and Defendant Bezruki, as her supervisor, engaged in a pattern and practice of retaliation against Plaintiff Givens, in violation of 42 U.S.C. § 2000e-3, because she engaged in a protected activity.

219.    Plaintiff Givens, in good faith, opposed conduct she reasonably believed to be, and which was, unlawfully discriminatory by reporting comments and actions of Defendant Bezruki for sexual harassment to both the City and Kansas Human Rights Commission.

220.    Defendant Bezruki retaliated against Plaintiff Givens in response to her protected activity by excluding her from meetings, reversing employment decisions made by Plaintiff Givens, ignoring her requests for an investigation while acknowledging and responding to requests by male employees Sgt. Mitchell and Defendant Nicholson, starting rumors about Plaintiff, and otherwise creating a hostile work environment for her.

221.    Plaintiff's protected activity was a determining or motivating factor in Defendants' retaliatory actions, as evidenced by Defendant Bezruki's refusal to cooperate with the City investigation, starting a rumor regarding Plaintiff trying to coordinate other women not to work with Sgt. Mitchell, and commenting that "slapping a woman's ass" was not sexual harassment.

222.    Defendants' actions would dissuade a reasonable person from reporting or attempting to discipline racial discrimination, sexual harassment, violence, and offensive comments in the workplace.

223.    Plaintiff Givens suffered economic and non-economic damages as a direct and proximate result of the retaliation she suffered.

224.    Defendants took materially adverse employment actions against Plaintiff because of those activities.

225.    The protected activity and adverse job action are causally connected.

226.    The work environment in the City was objectively and subjectively offensive.

227.    The harassment complained of was based on sex, race, and color.

228.    The conduct was severe and pervasive.

229.    Defendants discriminated against Plaintiff Givens based on her sex, race, and color, in violation of 42 U.S.C. § 2000(e).

230.    Defendants created a hostile work environment for people of color.

231.    Defendants created a hostile work environment for women.

232.    Plaintiff Givens received a "Right to Sue" letter dated December 15, 2022, and the lawsuit was filed on February 27, 2023, less than 90 days after receipt of said letter.

## COUNT TEN:
### Discrimination and Retaliation Under 42 U.S.C. Section 1981

233.    Plaintiffs incorporate by reference all other allegations set forth in the foregoing paragraphs as though reiterated herein.

234.    Defendants' discriminatory and retaliatory practices violated Plaintiffs' rights to the full and equal enjoyment of all benefits, privileges, terms, and conditions of their employment.

235.    Defendants' creation of a hostile environment and retaliatory actions interfered with

Plaintiffs' right to continued employment because of race, color, and sex, and because of a protected activity, in violation of 42 U.S.C. § 1981.

236.    Plaintiffs were discriminated and/or retaliated against by Defendants due to their attempts to address Defendants' racially and sexually discriminatory actions in the workplace, in violation of 42 U.S.C. § 1981.

237.    Plaintiffs opposed acts they believed in good faith violated 42 U.S.C. § 1981.

238.    Defendants illegally discriminated and/or retaliated against Plaintiffs with regard to the terms and conditions of their employment on account of their complaints about Defendants' discriminatory actions in the workplace based upon race, color, and sex.

239.    Plaintiffs complained about such illegal discrimination and harassment and were subject to retaliation as a result of their complaints.

240.    Defendants acted with willful and wanton disregard for the equal rights of African-American and female employees and engaged in discriminatory practices with malice or with reckless indifference to the federally protected rights of aggrieved individuals.

241.    As a direct and proximate result of Defendants' conduct, Plaintiffs sustained, and will continue to sustain, economic and non-economic damages.

242.    WHEREFORE, Plaintiffs pray for damages in excess of $75,000.00 for all counts, exclusive of interest, costs, and attorney fees; that Plaintiffs be granted attorney fees and costs pursuant to 42 U.S.C. § 1988 for each of the applicable claims; that Plaintiffs be granted pre and post-judgment interest on any damages awarded; that Plaintiffs be granted punitive damages against Defendants; and for other and such further relief as the Court deems just and equitable.

## **JURY TRIAL DEMAND**

243.    Plaintiff respectfully requests that this matter be tried by a jury of twelve (12) on

all of the claims against the Defendants.


Respectfully submitted,


/s/ James A.Thompson
James A. Thompson, SC #21263
MALONE, DWIRE & THOMPSON, LLC
P.O. Box 2082
Wichita, Kansas 67201-2082
Telephone: 316-265-4248
Email: jthompson@mdtlawyer.com
*Attorney for Plaintiffs Wanda Givens, Chet Pinkston, and Jose Salcido*