IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

WANDA GIVENS, CHET PINKSTON, and
JOSE SALCIDO,

     Plaintiffs,

v.

CITY OF WICHITA, et al.,

     Defendants.

Case No. 6:23-cv-01033-HLT-TJJ

## MEMORANDUM AND ORDER

This case is about different perspectives on how to run a police department. Plaintiffs Wanda Givens, Chet Pinkston, and Jose Salcido were Deputy Chiefs for the Wichita Police Department ("WPD") under former Chief Gordon Ramsay. Plaintiffs allege other members of the police department, Wichita public officials, and the Fraternal Order of Police, Lodge No. 5 ("FOP") and its officers created an environment of racism, sexism, harassment, corruption, and retaliation. Plaintiffs allege that they spoke out against this environment and suffered retaliation.

Plaintiffs sue seven individuals, the FOP, and the City of Wichita for violation of their constitutional rights, Title VII, 42 U.S.C. § 1981, and state law. Plaintiffs bring their constitutional claims under 42 U.S.C. § 1983, alleging that Defendants violated their First Amendment rights of association and speech and their Fourteenth Amendment rights of due process and equal protection.[1] Plaintiffs also allege that Defendants conspired to violate their constitutional rights.

---

[1]   Not all claims are by all Plaintiffs against all Defendants.

Givens alone alleges a claim under Title VII.[2] Plaintiffs' final claims are for violation of § 1981 and for outrage, defamation, and civil conspiracy under state law.

Defendants move to dismiss in four groups: (1) the City of Wichita, its City Manager Robert Layton, and former Interim Police Chief Troy Livingston (Doc. 70); (2) Chris Bezruki, former Human Resources Director for the City (Doc. 67); (3) Kevin Kochenderfer and Wendell Nicholson, former police Captains (Doc. 68); and (4) the FOP and two of its officers, Dave Inkelaar and Paul Zamorano (Doc. 65).

Resolution of these motions has been difficult. The difficulty largely stems from Plaintiffs' pleading style. Plaintiffs complain of wide-ranging conduct. But they rarely tie those complaints to specific Defendants. Some of the conduct complained of does not seem to be by named Defendants at all. And even though most of Plaintiffs' claims arise under § 1983, which looks to specific conduct by a specific actor, Plaintiffs collectively plead wrongdoing by "Defendants." Many claims also combine allegations of discrete discrimination, retaliation, and hostile work environment, all of which have different standards. Untangling this has been further complicated by Plaintiffs' response briefs to the various motions to dismiss, which are largely identical and often repeat the generalized collective allegations of the complaint.

Half of Defendants' motions include Rule 8 challenges,[3] which the Court addresses separately. Beyond that, the Court will address the specific claims in the first amended complaint. The Court has endeavored to identify at the beginning of each subsection of the analysis what the claim is, which Plaintiffs assert the claim, and against whom it is asserted. The Court first considers

---

[2]   Plaintiffs move to amend to add a Title VII claim on behalf of Salcido, too. The Court addresses that request near the end of this opinion.

[3]   *See, e.g.*, Docs. 67 at 1-4; 70 at 2-5. The other two motions do not specifically challenge the language of the complaint under Rule 8. But they do make broad complaints about the difficulty of addressing Plaintiffs' claims. Docs. 66 at 3; 69 at 2-3.

the constitutional claims brought under § 1983, followed by Plaintiffs' Title VII and § 1981 claims. Finally, the Court addresses Plaintiffs' state law claims. Ultimately, the Court dismisses all claims. And the Court denies Plaintiffs leave to add another claim.

## I.   BACKGROUND[4]

### A.   Plaintiffs

Givens was a Deputy Chief for the WPD. She retired from the department after thirty-four years of service in January 2022. Givens is an African American woman. Pinkston also was a Deputy Chief for the WPD. He retired after thirty-two years in February 2023. Pinkston is a white male. Salcido is a Deputy Chief of the WPD with twenty-seven years of service. Salcido is a Hispanic male. Plaintiffs all served under former WPD Chief Gordon Ramsay and comprised his executive staff from 2016 to 2022. Ramsay resigned in 2022. Ramsay is not a party to this case.

Plaintiffs allege that Defendants individually and collectively engaged in sexist, racist, and corrupt conduct. Plaintiffs objected to Defendants' practices and supported Ramsay in his efforts to discipline officers for misconduct. Plaintiffs allege that they were discriminated and retaliated against for their efforts to address corruption and unlawful discrimination. And they allege that Defendants conspired to drive them out and replace them with officers who "would be more pliable and willing to look the other way regarding the many serious problems [alleged by Plaintiffs]." Doc. 54 at 23. Plaintiffs suffered when Defendants created false press releases, conducted a rigged survey, and spread unfounded rumors. Pinkston and Salcido were passed over twice for the Interim Chief position. They were deprived of their job duties, had pay withheld, and were excluded from meetings.

---

[4]   The following facts are drawn from Plaintiffs' first amended complaint and are accepted as true for purposes of resolving the motions to dismiss. The Court notes that the first amended complaint was filed 2-3 months after an initial round of motions to dismiss were filed against the original complaint, and shortly after Plaintiffs had responded to those motions. *See* Doc. 53.

Givens and Pinkston retired early because of retaliation and the hostile work environment cultivated by Defendants. Both suffered harm to their reputation that made it difficult to find other employment. Salcido remains employed by WPD. But he has been subjected to retaliatory investigations and a false complaint, has lost job opportunities in other cities, and has suffered harm to his reputation.

### B.    Individual Defendants

Layton was and remains the Wichita City Manager. Plaintiffs spoke with Ramsay many times about Layton's inappropriate involvement in police-discipline cases. Layton was aware and resented Plaintiffs. Layton spearheaded the "good-old-boy network" with Bezruki. He arbitrarily overturned Plaintiffs' decisions on many occasions when the FOP disagreed with those decisions. And Layton knew that Bezruki had an inappropriate relationship with the FOP. But Layton did not overrule Bezruki's actions.

Livingston retired as a Deputy Chief. In that role, he conspired with the FOP and Bezruki. Layton brought Livingston out of retirement to be Interim Chief. As Interim Chief, Livingston isolated Salcido and Pinkston by "improperly depriving them of their responsibilities, leaving them out of meetings, eliminating their involvement in decisions normally made by Deputy Chiefs, and minimizing their ability to effectively do their jobs." *Id*. at 24.

Bezruki was the City's Human Resources Director. He also was the City's Ethics Officer and Givens's supervisor. Bezruki knew that Plaintiffs had spoken with Ramsay about Bezruki's involvement in police-discipline cases. Bezruki resented Plaintiffs for it. He interfered with police discipline. And he had an inappropriately close relationship with the FOP, accepting gifts in exchange for favorable treatment.

Kochenderfer was a Captain for the WPD and led the WPD's SWAT team. He was part of a text thread critical of Ramsay and Plaintiffs[5] and manipulated the results of a police survey to humiliate Plaintiffs. Both actions are discussed in more detail below.

Nicholson was a Captain for the WPD. Ramsay ordered an investigation of Nicholson for releasing confidential information. Nicholson acted with Kochenderfer to manipulate the police survey results.

Inkelaar is a detective for the WPD. He is also the President of the FOP. Inkelaar had an inappropriately close relationship with Bezruki and ran to him when Plaintiffs made decisions contrary to the FOP's position.

Zamorano is a WPD police officer. He is the resident agent of the FOP and the FOP liaison with Bezruki. Zamorano gifted alcohol and dinners to Bezruki in exchange for favorable treatment for the FOP. Zamorano would then go to Bezruki when Plaintiffs made decisions with which the FOP disagreed.

## C.      Summary of Events At Issue

The Court provides the following high-level summary of the events Plaintiffs allege support their claims. The Court attempts to list events roughly in the order in which they occurred.

---

[5] The first amended complaint includes specific texts between Kochenderfer and a non-party. It then details some other overtly vulgar and racist memes and images that were apparently part of some text thread, though it is not clear whether it was the same text thread Kochenderfer was a part of. In the first amended complaint, the overtly vulgar and racist memes and images are prefaced by the statement: "Lest there be any doubt, however, that Defendant Kochenderfer, and others in the WPD, as well as the Sheriff's Department, were motivated by racial hatred, their text threads were later discovered to contain the following [racist images]." Doc. 54 at 8-9. There are no direct allegations that Kochenderfer sent or remarked on any of those images. Nor is it clear exactly who was even on the text thread with the images. Plaintiffs' response briefs repeatedly state that the infamous text threads "were maintained by multiple WPD officers, including Kochenderfer's SWAT team." Doc. 73 at 17. But it is never specifically alleged that Kochenderfer—the only Defendant with a potential direct link to those texts—was part of that text thread. Instead, the first amended complaint is notably vague on this point despite some of the initial motions to dismiss that were filed in response the original complaint specifically pointing out issues regarding generic or collective pleading, *see, e.g.*, Doc. 23 at 3, the need for precise pleadings in § 1983 cases, *see, e.g.*, Doc. 25 at 5, and Rule 8 standards, *see, e.g.*, Doc. 30 at 2.

But many of them are undated or span a length of time. The Court discusses these events, other incidents, and Defendants' alleged involvement in more detail as needed throughout this order.[6]

- <u>Federal Grant Money</u>: The City received federal grant money to hire more officers. Layton tried to divert the funds by lowering the WPD's budget. Plaintiffs complained. Layton resented them for their criticism.

- <u>The Gang List</u>: Plaintiffs sought to implement a due-process procedure for removing and adding names to the Gang List, which was comprised predominantly of people of color. Givens and Salcido testified in a discrimination lawsuit because of their efforts to reform the Gang List. Defendants showed hostility and resentment toward Plaintiffs' reform efforts. Inkelaar initiated a false complaint against Salcido for creating a hostile work environment in the Gang Unit.

- <u>Officer Who Left the Scene of an Accident</u>: A WPD officer left the scene of a vehicular accident in 2017. Ramsay terminated her employment. But Livingston conspired with the FOP and Bezruki to rehire her. Bezruki reinstated the officer four days after termination.

- <u>Froese Shootings</u>: Former WPD officer Lee Froese (who is not a party) was involved in the fatal shooting of an unarmed black man in 2012. Froese was being investigated for the fatal shooting of a Hispanic male in December 2020.

- <u>Interference in Police-Shooting Investigations</u>: Inkelaar sent representatives to the scene of an officer-involved shooting in October 2020. Inkelaar also insisted that FOP representatives be present with an FOP-retained attorney representing another officer involved in a December 2020 shooting.

- <u>Kochenderfer Texts</u>: A text thread occurred in December 2020 between Justin Maxfield (who is not a party) and Kochenderfer. Maxfield congratulated Kochenderfer for his job in defending Froese. The thread included derogatory language about Ramsay. Its "text history" included a text from June 4, 2020, showing Ramsay standing next to a woman with a "Black Lives Matter" shirt. It also included an older statement by Maxfield about Froese. Kochenderfer communicated within the thread while physically within the Investigations Bureau office. He made several derogatory comments aimed at Ramsay and Plaintiffs. He seemingly supported Froese and commented on the incident while it was under investigation.

---

[6]   Some of these events are not mentioned again in any of the briefing. The Court includes them here because Plaintiffs included them in the first amended complaint. But Plaintiffs do not tie every event mentioned to a specific claim or explain how every event is relevant. The Court does not ignore these events within its analysis out of oversight. It is Plaintiffs' burden to connect facts to claims. Where Plaintiffs do not make that connection, the Court has not done it for Plaintiffs.

- <u>Text Scandal</u>: At some point, texts containing racist and vulgar images were exchanged among unspecified individuals in the WPD.[7]

- <u>Text Scandal Investigation</u>: The FOP, Inkelaar, and Zamorano went to Bezruki about the investigation into the text scandal, claiming that the texts were protected under the First Amendment. Bezruki then interfered in the investigation and overruled Plaintiffs. Layton tried to brush the text scandal under the rug and refused to exclude Bezruki from the investigation. Layton lied to the public, denying knowledge of the texting investigation. The text thread eventually was leaked to the media. Bezruki spread the false rumor that Givens was the source of the leak. Salcido claims that his discipline of the involved officers was brought up as a negative in his performance evaluation. But it was not addressed in Pinkston's evaluation. Inkelaar issued a press release on April 21, 2022, denying the FOP was involved in officer discipline during the text scandal.

- <u>Rapp Promotion</u>: WPD Officer Justin Rapp (who is not a party) shot an unarmed man in 2017. Rapp later told a supervisor that if he ran into the victim's mother, he would tell her to "get over the shooting because he had." *Id*. at 10. Plaintiffs denied Rapp a promotion while Ramsay was Chief. Givens authored a "skip letter" for Rapp's personnel file that explained why he was ineligible for promotion. But Layton and Bezruki promoted Rapp in 2022. Salcido was accused of leaking the "skip letter" but Plaintiffs believe Nicholson leaked the document.

- <u>Mitchell Incident and Reinstatement</u>: Sergeant Maurice Mitchell (who is not a party) "slapped the ass" of a female officer during a training exercise. Ramsay demoted Mitchell. Defendants intervened. Bezruki interfered with the investigation and reinstated Mitchell. Layton may have approved Mitchell's reinstatement. Bezruki repeated several times that "slapping the ass" of a female officer wasn't battery or even sexual harassment.

- <u>FOP's Involvement in Discipline</u>: Inkelaar tried to interfere with WPD discipline and remove WPD executive leadership in July 2021, stating in an email to Layton:

  > I am following up on the email I sent you last week asking for a meeting. I wanted to follow the chain of command and give you an opportunity to help us resolve some issues we are having with Chief Ramsay and the Command Staff. If you are not willing to meet, I

---

[7]  Plaintiffs do not clearly allege that Kochenderfer—or any other Defendant—was a recipient or part of the text thread containing these images. The first amended complaint states: "Lest there be any doubt, however, that Defendant Kochenderfer, and others in the WPD, as well as the Sheriff's Department, were motivated by racial hatred, their text threads were later discovered to contain the following [racist and vulgar images]." Doc. 54 at 8-9. As noted above, Plaintiffs' response briefs repeatedly state that the infamous text threads "were maintained by multiple WPD officers, including Kochenderfer's SWAT team." Doc. 73 at 17. These statements lead to an inference that Kochenderfer was perhaps aware of the racist images. But there are no allegations that Kochenderfer sent or remarked on these images. Given that Plaintiffs were aware of the messages, participated in the investigation, and are now in possession of at least some of the offensive messages, it would seem they would be in a position to fully and clearly allege the role each Defendant played in the text scandal. They have not done so.

will address my concerns with the city council and the media, if
necessary.

*Id.* at 18-19.

- <u>Givens's Grievance</u>: Givens filed a grievance with the City in August 2021. She complained about Bezruki's comments that "slapping the ass" of a female officer was not sexual harassment. Bezruki refused to cooperate with the investigation. The City failed to force his cooperation, thereby creating a hostile work environment for Givens. Bezruki then initiated and fostered a false rumor in September 2021 that Givens started a petition for females not to work with Mitchell. The rumor was repeated and spread within the FOP.

- <u>Community Meeting</u>: Givens invited Bezruki to attend an August 2021 community meeting with representatives of the NAACP, Ministerial League, Racial Profiling Advisory Board, and other concerned citizens. Bezruki accepted the meeting but then failed to attend.

- <u>Bezruki's Relationship with the FOP</u>: Bezruki accepted gifts from the FOP in exchange for favorable treatment. Salcido received an ethics complaint in July 2021 about Bezruki's acceptance of gifts from the FOP. Salcido forwarded the complaint to the Assistant City Manager. Salcido then spoke with the FBI in December 2021 about Bezruki's relationship with the FOP. Inkelaar met with Layton to get Salcido to suppress the report of Bezruki's relationship with the FOP. Zamorano supported Inkelaar in his effort.

- <u>The Rigged Survey</u>: Dr. Delores Craig-Moreland at Wichita State University (who is not a party) conducted a survey in late 2021. Nicholson and Kochenderfer circulated the survey among select officers to produce manipulated results intended to damage Plaintiffs' reputations. Craig-Moreland notified Ramsay on November 10, 2021, that the survey was compromised and she needed to withdraw the information. Pinkston instructed Nicholson and Kochenderfer twice not to conduct the survey. But they continued and selectively released false information for publication in the *Wichita Eagle*. Two of the comments published were: "Top police leadership is more concerned with public image and assigning blame than addressing the issues"; and "Officers in the focus group said efforts to diversify the department have led to the hiring of under-qualified people who don't stay long and who may jeopardize the safety for all officers." *Id.* at 26. Plaintiffs allege the information was released in August or September of 2021. They also allege that "[t]he release of the rigged survey was contemporaneous with Plaintiff Salcido's report to the FBI regarding Defendant Bezruki; Bezruki's interference with the racist text investigation; Plaintiff [Givens's] report to the City and KHRC; and an email from the FOP President, Defendant Inkelaar, to Defendant Layton asking for his help in dealing with former Chief Ramsay and the 'command staff,' as well as other issues addressed herein." *Id.* at 26.

- <u>Denials of Promotions and Job Duties</u>: Layton designated Lemuel Moore (who is not a party) to replace Givens as acting Deputy Chief when she retired. After Moore had been in that role for a month, Layton appointed Moore to Interim Chief, over Salcido and Pinkston. Both Salcido and Pinkston had approximately six years of experience as Deputy Chief. Layton then passed over Salcido and Pinkston a second time when he brought back

Livingston from retirement to act as Interim Chief. Layton interviewed Nicholson for the WPD Chief position, as well. Layton told at least one candidate for Interim Chief that he wanted them to discipline or terminate Salcido and Pinkston. Layton marginalized and tried to force Pinkston and Salcido out after Ramsay resigned. He left them out of the selection process for an Interim Deputy Chief. And he gave assignments to the Interim Deputy Chief, isolating Pinkston and Salcido in their job duties.

- <u>Denial of a Personal Car for Inkelaar</u>: Inkelaar filed a grievance in February 2022 about being required to share a city-owned vehicle with two other officers instead of being given his own. Salcido investigated the grievance. Salcido held an initial meeting with Inkelaar about the grievance in an interview room, where meetings are recorded. Inkelaar complained to the FOP and Bezruki. Bezruki forbade recording meetings with the FOP. Salcido ultimately denied the grievance. The FOP appealed and Ramsay denied the appeal. The FOP appealed again to the Human Resources department, who reversed the decision of leadership.

- <u>Channel 12 Interview</u>: Salcido and Pinkston participated in a television interview in May 2022 with KWCH Channel 12. The story was titled "Wichita Police Leaders Back Former Chief, Echo Concerns About Internal Review." Plaintiffs were not in uniform during the interview. They defended and supported Ramsay's letter to the Wichita City Counsel about the "racist, homophobic, and sexist text messages throughout the summer of 2021." *Id.* at 30. Defendants defamed, retaliated, and created a hostile work environment for Salcido and Pinkston in response.

- <u>Nicholson Investigation</u>: Ramsay ordered an investigation into Nicholson for releasing confidential information. Bezruki made Pinkston rewrite Nicholson's evaluation five times before he would approve it. Layton asked both Ramsay and former Interim Chief Moore to give Nicholson a "restart" in the ongoing investigation. Layton then brought in Livingston as Interim Chief to cover up Nicholson's conduct. Nicholson was allowed to retire in March 2023. But the day after retirement he was charged with eight felonies related to releasing confidential information. Livingston declared the allegations against Nicholson to be unfounded.

## II.   STANDARD

Federal complaints are subject to Rule 8. This rule requires that pleadings must contain "a short and plain statement" of the claims, along with allegations that are "simple, concise, and direct." Fed. R. Civ. P. 8(a)(2), (d)(1). The purpose of Rule 8 is to give a defendant fair notice of the claims against it. *Schupper v. Edie*, 193 F. App'x 744, 745-46 (10th Cir. 2006). A pleading should not be so lengthy or complex that it places an undue burden on a responding party. *See D.M. by & through Morgan v. Wesley Med. Ctr. LLC*, 2018 WL 4222382, at *3 (D. Kan. 2018).

Failure to provide a short and plain statement that complies with Rule 8 is sufficient grounds to dismiss a complaint. *Mann v. Boatright*, 477 F.3d 1140, 1147-48 (10th Cir. 2007). This is a matter within the district court's discretion. *Schupper*, 193 F. App'x at 745.

A complaint survives a Rule 12(b)(6) motion to dismiss when it contains "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is plausible if it contains sufficient factual content to allow a court "to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* The plausibility standard requires "more than a sheer possibility that a defendant has acted unlawfully," but it "is not akin to a 'probability requirement.'" *Id.* "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Id.* (quoting *Twombly*, 550 U.S. at 557) (internal quotations omitted). A court undertaking this analysis accepts as true all well-pleaded allegations in the complaint but need not accept legal conclusions. *Id.* Likewise, conclusory statements are not entitled to the presumption of truth. *Id.* at 678-79.

## III.    ANALYSIS

### A.    Rule 8

As a preliminary matter, the Court returns to the general drafting problem with Plaintiffs' first amended complaint: it is complicated, confusing, and contains excessive references to seemingly irrelevant matters. It contains 243 paragraphs spanning 41 pages. There are countless allegations against non-parties. Legally distinct claims are conflated into single counts. And the timeline is nearly impossible to construct because the first amended complaint contains relatively few dates. In short, it does not comply with Rule 8.

Two groups of Defendants move to dismiss based on Rule 8. The other two do not. But the Court may raise Rule 8 problems sua sponte. *See Nasious v. Two Unknown B.I.C.E. Agents*, 492 F.3d 1158, 1161, n.2 (10th Cir. 2007); *United States ex rel. Braithwaite v. Kansas*, 2020 WL 837431, at *1 (D. Kan. 2020).

Complex pleadings are not unheard of in federal court. But it is not the job of the Court or the opposing parties to sort through a pleading to try to construct a plaintiff's claims. *Schupper*, 193 F. App'x at 746; *McHenry v. Renne*, 84 F.3d 1172, 1179 (9th Cir. 1996) ("Prolix, confusing complaints such as the ones plaintiffs filed in this case impose unfair burdens on litigants and judges."); *U.S. ex rel. Garst v. Lockheed-Martin Corp.*, 328 F.3d 374, 378 (7th Cir. 2003) ("Rule 8(a) requires parties to make their pleadings straightforward, so that judges and adverse parties need not try to fish a gold coin from a bucket of mud."). Further, unnecessary "[p]rolixity of a complaint undermines the utility of the complaint." *Baker v. City of Loveland*, 686 F. App'x 619, 620 (10th Cir. 2017). Ultimately, "[s]omething labeled a complaint but written more as a press release, prolix in evidentiary detail, yet without simplicity, conciseness and clarity as to whom plaintiffs are suing for what wrongs, fails to perform the essential functions of a complaint." *McHenry*, 84 F.3d at 1180. A press release masquerading as a complaint is a fitting description of the first amended complaint.

Plaintiffs' first amended complaint fails to satisfy Rule 8. The Court dismisses it for this reason alone. Plaintiffs were aware of this issue based on both the initial motions, *see, e.g.*, Docs. 30 at 2; 26 at 2, and the current motions, *see, e.g.*, Docs. 67 at 1-4; 70 at 2-5, that raised this issue. Plaintiffs could have tried to fix the issue. They did not. They should also independently be aware of their obligations under Rule 8. The first amended complaint does not satisfy this rule. It is long, confusing, and untethered. The Court therefore dismisses it under Rule 8. But the Court analyzes

the remaining arguments under Rule 12(b)(6) for completeness, which provide alternative grounds for dismissal.

### B.      Constitutional Claims Brought Under 42 U.S.C. § 1983

Claims under § 1983 require more specificity than Rule 8 alone. As noted, Plaintiffs frequently use the collective term "Defendants" to identify who took the complained-of actions. But under § 1983, any adverse employment action claimed must have been taken by a <u>specific</u> defendant against a <u>specific</u> plaintiff.[8] The same goes for the creation of a hostile work environment. This is because any constitutional violation must be traceable to a defendant's <u>own</u> actions. *Pahls v. Thomas*, 718 F.3d 1210, 1225-26 (10th Cir. 2013). The Court's overriding concern about many of Plaintiffs' claims is that they allege generally objectionable conduct by Defendants collectively. !

The Court thus begins its analysis of the constitutional claims with a discussion of the personal-participation requirement under § 1983, followed by a brief recitation of Plaintiffs' allegations against each individual Defendant. The individual Defendants have raised the qualified immunity defense, so the Court next identifies the standard for that defense. The remaining subsections of this analysis address the specific constitutional claims against Defendants, applying the personal-participation requirement, the qualified immunity standard, and the substantive legal standard governing each claim.

### 1.      Personal Participation Requirement

Plaintiffs bring § 1983 First Amendment claims against all Defendants for retaliation based on Plaintiffs' association with Ramsay and retaliation and hostile work environment because of

---

[8]    The "adverse employment action" terminology is an "adverse action" for non-employer defendants. The Court uses the terms interchangeably here as any distinction does not factor in the analysis.

Plaintiffs' speech. They bring § 1983 Fourteenth Amendment claims against the City, Layton, Bezruki, and Livingston for deprivation of their liberty interest in their reputations without due process. And Salcido and Givens bring § 1983 Fourteenth Amendment claims against the City, Layton, Bezruki, and Livingston for treating them differently from similarly situated people based on their race (Salcido and Givens) and sex (Givens only).

Each of these claims requires specific allegations of personal participation by each defendant involved. *See Henry v. Storey*, 658 F.3d 1235, 1241 (10th Cir. 2011); *Fogarty v. Gallegos*, 523 F.3d 1147, 1162 (10th Cir. 2008). This means that as to each individual defendant, each plaintiff must allege an adverse employment action that each defendant took or actions by each defendant that independently created a hostile work environment.

As an initial matter, Plaintiffs allege that all individual Defendants "reacted with hostility and resentment towards [Plaintiffs'] attempts at protecting the rights of African and Hispanic Americans, fostering a hostile work environment for Plaintiffs and conspiring to remove them from their positions." Doc. 54 at 19. They also globally allege that "Defendants subjected Plaintiffs to a campaign of public harassment and ridicule, in addition to adverse employment actions . . . ." *Id*. at 33. And Plaintiffs allege Defendants conspired "to isolate them in their official capacities and to remove them from their official positions." *Id*. These broad and categorical allegations are insufficient to allege personal participation in adverse employment actions or in the creation of a hostile work environment against Plaintiffs sufficient to sustain a § 1983 claim.

Turning to the remaining allegations, the Court spent considerable time reviewing the first amended complaint to identify where Plaintiffs make specific allegations against specific Defendants. The Court has attempted with the following list to isolate the allegations against each and summarize them. For the sake of completeness (and also to highlight the number of allegations

in the first amended complaint unrelated to any harm Plaintiffs personally allege), the Court includes allegations below that do not clearly connect to any claim or to Plaintiffs. The Court notes in bold those allegations about actions specifically taken against Plaintiffs, though this is not meant to indicate the bolded actions are sufficient to support any particular claim.

- Layton: **Layton brought Livingston back to discipline Pinkston and Salcido** and cover up the criminal conduct of Nicholson. Layton knew Plaintiffs spoke with Ramsay about his involvement in police-discipline cases and resented Plaintiffs for it. He interfered with the text investigation and **overruled Plaintiffs multiple times.** He lied to the public and appointed a review committee including Bezruki even though there was a conflict of interest. Layton asked Ramsay to go easy on Nicholson and promoted Rapp. Layton tried to divert the federal grant money. **He also arbitrarily reversed many of Plaintiffs' decisions.** He spearheaded the "good-old-boy network" with Bezruki. **And he appointed other Interim Chiefs instead of Salcido and Pinkston despite their experience. He told at least one applicant he wanted them to come in and terminate or discipline Salcido and Pinkston. Layton then marginalized Salcido and Pinkston and tried to force them out.**

- Livingston: Livingston came out of retirement to serve as Interim Chief. Livingston found the allegations against Nicholson unfounded despite overwhelming evidence of misconduct. Livingston rehired the officer who Ramsay terminated for leaving the scene of an accident. **And Livingston isolated Salcido and Pinkston in their job duties by "improperly depriving them of their responsibilities, leaving them out of meetings, eliminating their involvement in decisions normally made by Deputy Chiefs, and minimizing their ability to effectively do their jobs."** *Id.* at 24.

- Bezruki: Bezruki knew Plaintiffs spoke with Ramsay about his involvement in police-discipline cases and resented Plaintiffs for it. He interfered with the text scandal investigation and **overruled Plaintiffs.** Bezruki sat on the internal review committee to examine the WPD's handling of the text scandal. **He required Pinkston to rewrite Nicholson's review five times. He reversed several of Plaintiffs' decisions about officer discipline** while enjoying an inappropriately close relationship with the FOP. **He denied to Givens that "slapping the ass" of a female officer was sexual battery or harassment. He also failed to show up at a meeting that Givens had arranged** and accepted inappropriate gifts from the FOP in exchange for favorable treatment. **Bezruki refused to cooperate in an investigation stemming from Givens's grievance. And he spread rumors about Givens and excluded her from meetings.**

- Kochenderfer: Kochenderfer conducted the survey with Nicholson and **released false information from the survey. He texted rude and derogatory remarks to Justin Maxfield about Plaintiffs,** Ramsay, and an ongoing investigation. He was possibly included on the string of racist and sexist texts that were part of the text scandal.

- Nicholson: Nicholson is believed to have "**leaked the skip letter in a concerted effort to publicly humiliate Plaintiffs,**" but Salcido was accused of leaking it. *Id.* at 14. Nicholson released confidential information but was allowed to retire. Nicholson conducted the survey with Kochenderfer and **released false information from the survey**.

- Inkelaar: Inkelaar interfered with the text scandal investigation by going to Bezruki and claiming the texts were protected under the First Amendment. **He spread the false rumor that Givens leaked the information about the text messages.** He insisted on FOP representatives being present for certain investigations and ran to Bezruki when the FOP disliked the decisions of Plaintiffs. Inkelaar also emailed Layton about resolving issues the FOP was having with Ramsay and Plaintiffs. He later met with Layton about it and tried to suppress the report of Bezruki's illegal relationship with the FOP. He complained when meetings about his grievance were recorded. **And he issued a press release that criticized city leaders about their handling of the text scandal. Finally, Inkelaar initiated false complaints about Salcido creating a hostile work environment in the Gang Unit. And he spread the rumor that Givens started a petition for women not to work with Mitchell.**

- Zamorano: Zamorano interfered with the text scandal investigation by going to Bezruki and claiming the texts were protected under the First Amendment. He ran to Bezruki when the FOP didn't like the decisions of Plaintiffs. He gifted alcohol and dinners to Bezruki. And he supported an attempt to suppress the report of Bezruki's illegal relationship with the FOP.

The Court will discuss these actions of the individual Defendants in its analysis of each claim below. The personal participation requirement is not only relevant to liability under § 1983, but also to whether a defendant is entitled to qualified immunity. *Pahls*, 718 F.3d at 1227. Courts often consider their components together. *Id.* The Court turns to that standard next.

### 2.    Qualified Immunity

Defendants assert qualified immunity for their actions. Qualified immunity protects public officials from civil liability provided their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). "Put simply, qualified immunity protects all but the plainly incompetent or those who knowingly violate the law." *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (internal quotations omitted). Once an official has raised a qualified immunity defense, the plaintiff bears

the burden to show that (1) the official violated a statutory or constitutional right, and (2) the right was "clearly established" at the time of the conduct at issue. *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011). The order in which these two prongs are evaluated is within a court's discretion. But once a defendant asserts qualified immunity, there is a presumption of immunity. *Estate of Taylor v. Salt Lake City*, 16 F.4th 744, 757 (10th Cir. 2021).

A right is "clearly established" for qualified immunity purposes where it is "sufficiently clear that every reasonable official would have understood" his conduct to have violated that right. *Mullenix*, 577 U.S. at 11 (citation and internal quotations omitted). To satisfy this step, courts do not require a case "directly on point." *al-Kidd*, 563 U.S. at 741. But the plaintiff must identify existing precedent. This may be controlling authority or "a robust 'consensus of cases of persuasive authority.'" *Id.* at 742. Either way, the authority must place the constitutional question "beyond debate." *Id.* at 741. The precedent "must be 'particularized' to the facts of the case" before the court. *White v. Pauly*, 580 U.S. 73, 79 (2017) (noting that courts should not define "clearly established law" at "a high level of generality").

Plaintiffs dispute the applicability of qualified immunity by repeating in all four response briefs that "[d]eciding upon the affirmative defense of qualified immunity is generally inappropriate at this stage of litigation." Docs. 71 at 4; 72 at 4-5; 73 at 4; 74 at 6. This argument is insufficient and incorrect. The purpose of the doctrine is to offer immunity from suit, not to provide a "mere defense to liability." *Mitchell v. Forsyth*, 472 U.S. 511, 525 (1985). Qualified immunity can be raised at any stage of the litigation. At the pleading stage, in the face of a motion to dismiss, a plaintiff must still plead facts plausibly alleging the violation of a clearly established constitutional right. *Schwartz v. Booker*, 702 F.3d 573, 579 (10th Cir. 2012). A plaintiff cannot simply opt to delay the qualified immunity inquiry until later in the case.

The Court applies this standard, incorporating the personal participation requirement, to the § 1983 claims against the individual Defendants below. And as discussed below, the outcome of the claims against the individual Defendants determines the outcome of the claims against the City and the FOP.

### 3.   Count One: § 1983 First Amendment Claim Based On Association

Count One is a § 1983 First Amendment retaliation claim based on the freedom of association. The claim is brought by all Plaintiffs against all Defendants and states that "Defendants' actions, as described herein, amounted to retaliation against Plaintiffs . . . for their association with, as his Deputy Chiefs, former Chief Gordon Ramsay." Doc. 54 at 31. Beyond this, it is not clear what specific conduct of which specific Defendant is alleged to have interfered with Plaintiffs' association with Ramsay, other than the allegations of the first amended complaint overall. Regardless, the claim is not viable even assuming personal participation by each Defendant.

The First Amendment's right to associate protects an individual's decision to "enter into and maintain certain intimate human relationships." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 617-18 (1984). Those relationships typically are familial relationships, not relationships in an employment context. *Copp v. Unified Sch. Dist. No. 501*, 882 F.2d 1547, 1551 (10th Cir. 1989). They can also be expressive relationships, or associations for the purpose of engaging in protected activities such as speech, assembly, and redress of grievances. *Roberts*, 468 U.S. at 618. The key issue here, then, is whether the association between Plaintiffs and Ramsay is one protected by the Constitution. Defendants also challenge whether Plaintiffs have adequately alleged causation for each Defendant.

A co-worker relationship is not a constitutionally protected relationship. *See Copp*, 882 F.2d at 1551 (declining to find protected relationship between high school custodian and former principal); *McDonald v. City of Wichita, Kan.*, 156 F. Supp. 3d 1279, 1305 (D. Kan. 2016); *Good v. Bd. of Cnty. Comm'rs*, 331 F. Supp. 2d 1315, 1325-26 (D. Kan. 2004); *Busey v. Bd. of Cnty. Commr's of Shawnee Cnty., Kan.*, 277 F. Supp. 2d 1095, 1111 (D. Kan. 2003). Plaintiffs cite *Dillon v. Twin Peaks Charter Academy*, 241 F. App'x 490, 494-95, 498 (10th Cir. 2007), for the position that co-worker relationships can be protected relationships. But *Dillon* does not say this. The public charter school paraprofessional in *Dillon* met with other teachers off campus and after hours to discuss concerns about the operation, management, and mission of the school. The district court treated the plaintiff's freedom-of-association retaliation claim as part of the plaintiff's freedom-of-speech retaliation claim. It granted summary judgment because the matters of discussion were not matters of public concern and because the paraprofessional did not suffer an adverse action.

The Tenth Circuit reversed. It concluded that the district court erred when it held that the paraprofessional was not discussing matters of public concern and did not suffer an adverse employment action. The Tenth Circuit reinstated the freedom-of-association claim but did not specifically address whether co-worker association is protected. It thus does not bear directly on the instant case.

The facts in *Dillon* and other association cases are distinguishable. *Dillon* was not a situation of an executive team meeting with their leader to discuss employment-related matters during working hours. And Plaintiffs were not discussing politics as in other cases. *See, e.g.*, *Bass v. Richards*, 308 F.3d 1081, 1090 (10th Cir. 2002). All Plaintiffs' allegations suggest nothing more than a fractured workplace where Plaintiffs sided regularly with the Chief on matters of workplace culture and discipline, while others took contrary positions. Plaintiffs have not alleged a

relationship protected by the Constitution. They therefore fail to state a plausible § 1983 claim for retaliation based on association. The Court dismisses Count One against all individual Defendants because there is no constitutionally protected relationship at issue.

Plaintiffs' failure to state a constitutional violation also means that the individual defendants are all entitled to qualified immunity on this claim. Alternatively, Plaintiffs have not identified caselaw showing a clearly established constitutional right to associate with Ramsay. They have instead identified readily distinguishable caselaw that would not put Defendants on notice that their actions violated a clearly established constitutional right. *See, e.g.*, *Dillon*, 241 F. App'x 490. Dismissal of Count One against the individual defendants is warranted for these additional reasons.

The above analysis ultimately means that this claim also fails against the City of Wichita and the FOP. A municipality (the City) can only be held liable under 42 U.S.C. § 1983 for the actions of its employees when the action is taken pursuant to the municipality's "official policy," *Pembaur v. City of Cincinnati*, 475 U.S. 469, 479 (1986) (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978)), or for acts it has sanctioned or ordered, *Brammer-Hoelter v. Twin Peaks Charter Acad.*, 602 F.3d 1175, 1188 (10th Cir. 2010). But there also must be an underlying constitutional violation. *See Quintana v. Santa Fe Cnty. Bd. of Comm'rs*, 973 F.3d 1022, 1034 (10th Cir. 2020) (identifying elements). Plaintiffs' failure to plead a viable constitutional violation based on freedom of association dooms their *Monell* claim against the City and the claim is dismissed.[9]

---

[9]   Plaintiffs make a few general *Monell* allegations in their first amended complaint. They also argue that *Monell* liability is a fact-intensive inquiry that does not lend itself to the pleading phase, citing *Boyer v. City of Philadelphia*, 2015 WL 9260007, at *1, *7 (E.D. Pa. 2015). Doc. 71 at 8. But it is not premature to dismiss claims against the City where there is no underlying plausible claim against any individual Defendant.

The FOP is not a municipality (or at least Plaintiffs do not allege it is one). The FOP challenges whether it is a "state actor" as required for § 1983 liability. But even if the Court assumes without deciding that the FOP is a state actor, there still must exist a deprivation of a federal right. *See Gomez v. Toledo*, 446 U.S. 635, 640 (1980). Again, that deprivation is missing here because there is no underlying constitutional violation. The First Amendment claim based on association is dismissed against the FOP for the same reasons it is dismissed against the others.

### 4. Count Two: § 1983 First Amendment Claim Based on Speech

Count Two is a § 1983 First Amendment claim for retaliation and hostile work environment based on Plaintiffs' exercise of protected speech. Plaintiffs claim they engaged in protected speech on matters of public concern and as a result, "Defendants subjected Plaintiffs to a campaign of public harassment and ridicule, in addition to adverse employment actions, in retaliation for exercising their First Amendment rights." Doc. 54 at 32-33. The claim is by all Plaintiffs against all Defendants.

#### a. Retaliation

The parties agree that Plaintiffs' First Amendment retaliation claim is governed by the five-part *Garcetti/Pickering* test, at least as against Layton, Livingston, Bezruki, and the City:[10]

1. The protected speech was not made pursuant to an employee's official duties.

2. The protected speech addressed a matter of public concern.

3. The government's interests as an employer did not outweigh the employee's free-speech interests.[11]

---

[10] Both sides contend this test also applies to their claims against Kochenderfer and Nicholson. Docs. 69 at 8-9; 73 at 10; 82 at 6. The Court is not so sure. Kochenderfer and Nicholson are not employers and are instead Plaintiffs' subordinates. But for purposes of this motion, the Court will accept the parties' representation that the *Garcetti/Pickering* test applies to the claims against Kochenderfer and Nicholson.

[11] Defendants do not discuss the third factor. Plaintiffs briefly argue that this factor weighs in their favor because Defendants hindered the government's operations through "violence and related lawsuits, racism, sexism,

4. The protected speech was a motivating factor in the adverse employment action.

5. The defendant would not have made the same employment decision in the absence of the protected speech.

*Lincoln v. Maketa*, 880 F.3d 533, 538 (10th Cir. 2018). Courts decide the first three factors as a matter of law. *Brammer-Hoelter v. Twin Peaks Charter Acad.*, 492 F.3d 1192, 1203 (10th Cir. 2007). The last two ordinarily present issues of fact. *Id.* The standard for evaluating a First Amendment retaliation claim "is analogous" to the standard used in a Title VII case. *Lincoln*, 880 F.3d at 540. The fourth factor identified under *Lincoln* requires the employer to take some adverse employment action against the employee. *Id.* at 539-40. The question is whether the action would dissuade a reasonable person from exercising First Amendment rights. *Id.* at 540.

There is an alternate, but similar, test for individuals who are not employers or under contract with the speaker: (1) the plaintiff "engaged in constitutionally protected activity"; (2) the defendant's actions caused the plaintiff "to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity"; and (3) the "defendant's adverse action was substantially motivated" by plaintiff's protected activity. *Worrell v. Henry*, 219 F.3d 1197, 1212 (10th Cir. 2000). The parties agree this test applies to the claims against Inkelaar, Zamorano, and the FOP.

There are several issues Defendants raise as to this claim: First, was the speech made pursuant to Plaintiffs' official duties? Second, did the speech address a matter of public concern? Third, who knew about the speech, and was there an adverse action causally linked to it? And fourth, can subordinates retaliate under the First Amendment? The Court assumes without deciding

---

cronyism, corruption, etc." Doc. 71 at 6 n.43. The Court accepts for purposes of this motion that Plaintiffs' free speech rights outweighed any interests of the City as an employer.

that Plaintiffs can prevail on the first two issues, at least as to some of their alleged speech. The Court turns directly to the third issue and will touch on the fourth within it.

Defendants contend that Plaintiffs fail to allege they were subject to adverse action on the basis of any protected speech.[12] "An adverse employment action constitutes a significant change in employment, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits."[13] *Tapia v. City of Albuquerque*, 170 F. App'x 529, 533 (10th Cir. 2006) (internal quotation omitted). The adverse-action standard in the First Amendment context is less demanding than in the Title VII context. *Baca v. Sklar*, 398 F.3d 1210, 1220-21 (10th Cir. 2005). "[A]ctions short of an actual or constructive employment decision can in circumstances violate the First Amendment." *Morfin v. Albuquerque Pub. Sch.*, 906 F.2d 1434, 1437 n.3 (10th Cir. 1990). Co-worker harassment can constitute an adverse employment action (i.e., retaliation) if it is severe enough. But the alleged retaliatory harassment must be both objectively and subjectively offensive, rising to some level of substantiality. *Lujan v. Johanns*, 181 F. App'x 735, 738 (10th Cir. 2006). Humiliation alone is not enough. *Lincoln*, 880 F.3d at 543.

The Court first considers allegations against Layton, Livingston, and Bezruki. Salcido and Pinkston allege they were passed over for promotions and interviews and had pay increases withheld. Salcido and Givens allege they were forced into early retirement. And all three allege they were isolated from core job duties. Plaintiffs also allege that these actions were taken because of their protected speech. But beyond blaming Layton and Livingston (and Bezruki to some

---

[12]   The adverse action requirement applies under either the *Garcetti/Pickering* test or the *Worrell* test.

[13]   For the FOP, Inkelaar, and Zamorano, the test is whether the defendant's actions caused the plaintiff "to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity." The difference is insignificant for purposes of this order.

extent)[14] in general, they use passive voice and imprecise language and do not allege who took which actions. Specifically, the following examples are representative of Plaintiffs' allegations purportedly targeted at Layton, Livingston, and Bezruki:

- "<u>Defendants</u> took retaliatory actions, including, but not limited to, withholding already approved pay raises for Plaintiffs Salcido and Pinkston for approximately six months, and passing over Salcido and Pinkston for promotion to Interim Police Chief." Doc. 54 at 21 (emphasis added).

- "Deputy Chief Givens retired early due to the hostile work environment created by <u>Defendants</u>." *Id.* at 23 (emphasis added).

- "Defendant <u>Livingston</u> . . . isolated Plaintiffs Salcido and Pinkston in their job duties by improperly depriving them of their responsibilities, leaving them out of meetings, eliminating their involvement in decisions normally made by Deputy Chiefs, and minimizing their ability to effectively do their jobs." *Id.* at 24 (emphasis added).

- "Mr. <u>Layton</u> had also marginalized and tried to force out Plaintiffs Pinkston and Salcido by giving assignments to the remaining interim Deputy Chief after Chief Ramsay resigned, thereby isolating them in their job duties. The role of Deputy Chiefs is to manage the three respective divisions within the WPD. However, in selecting the replacement for Mr. Moore once he was promoted to interim Chief, Deputy Chiefs Pinkston and Salcido were not allowed to sit in on interviews in that regard, which interviews had always been a responsibility and duty of the Deputy Chiefs. Thereby, Plaintiffs Pinkston and Salcido were ostracized and diminished relative to what should have been their proper place within the WPD's executive ranks." *Id.* (emphasis added).

- "When Mr. Moore resigned as the interim Chief, Defendant <u>Layton</u> brought in Defendant Livingston to replace Mr. Moore as the interim Chief, thereby passing over Plaintiffs Salcido and Pinkston for a second time, despite their possessing considerably more experience." *Id.* (emphasis added).

- "While still a Deputy Chief, Mr. Pinkston experienced retaliatory actions including withholding of pay, removal of job duties, and exclusion from meetings." *Id.* at 25.

- "In retaliation for [the 2022 interview], <u>Defendants</u> defamed and retaliated and created a hostile work environment for Plaintiffs Salcido and Pinkston." *Id.* at 30 (emphasis added).

---

[14] It is unclear to the Court what role Bezruki played or how much authority he had over Plaintiffs and the decisions about their employment. Plaintiffs allege that Bezruki was Givens's supervisor. Doc. 54 at 38. And Plaintiffs allege that Bezruki, like Layton, had "expansive powers" within the City. *Id.* at 23. But who carried the power to hire, fire, and make salary decisions? It seems Layton does. This leaves Bezruki's role unclear.

- "As a result of his speaking out, Deputy Chief Salcido has experienced retaliatory actions, including withholding of pay; removal of job duties; exclusion from meetings; a concerted effort to defame him and the other Plaintiffs with false press releases, a rigged survey, and rumors; and other retaliatory actions designed to minimize Mr. Salcido's role in the WPD and force him to resign. As a result of the retaliatory acts, as alleged herein, taken by <u>Defendants</u>, Deputy Chief Salcido has been passed over for promotion, lost job opportunities in other cities (including Derby, Kansas and Austin, Texas), and suffered harm to his reputation as a police officer." *Id.* at 31 (emphasis added).

These allegations fail to inform the Court who took what actions (with the exception of Livingston isolating and Layton passing over, marginalizing, and trying to force out Pinkston and Salcido). Plaintiffs cite paragraphs in their first amended complaint that purportedly include adverse employment actions that Bezruki took. Doc. 72 at 14, n.95-n.100. But those citations do not point to adverse actions specifically taken by Bezruki. Instead, they refer to actions by Defendants generally and actions by Layton. Bezruki's name is not even mentioned in most of the citations. The lodging of a § 1983 claim against a particular person requires more. Plaintiffs have not plausibly alleged that Bezruki personally participated in a constitutional violation. The Court will assume without deciding that Plaintiffs have identified at least some adverse employment action by Layton and Livingston. But the assumption does not save their claim.

This is because even if the Court assumes that Layton and Livingston took adverse employment actions against Salcido and Pinkston, Plaintiffs do not connect those actions with any particular protected speech. In fact, elsewhere in the first amended complaint, Plaintiffs even suggest that some these actions were taken to protect Nicholson, and not in retaliation against Plaintiffs. *See, e.g.,* Doc. 54 at 13 ("Defendant Layton then brought in Defendant Livingston, who had retired, to replace Mr. Moore as interim Chief and cover up the criminal conduct of Defendant Nicholson."); *id.* at 24 ("Defendant Livingston was brought in as interim Chief to replace Mr. Ramsay, clear Defendant Nicholson, and discipline Plaintiffs Pinkston and Salcido."). There are relatively few dates in the first amended complaint, particularly as compared to the number of

allegations. Temporal proximity, of course, is not the only way to connect protected action with retaliatory actions. But there must be some connection. Allegations of that connection are missing here. Accordingly, Plaintiffs have failed to state a First Amendment retaliation claim against Layton, Livingston, or Bezruki.

As for Kochenderfer and Nicholson, specific allegations of adverse actions are even more sparse. Kochenderfer and Nicholson are alleged to have manipulated a survey and disclosed the results. Plaintiffs accuse Nicholson of leaking the "skip letter." But these are just allegations that Kochenderfer and Nicholson caused Plaintiffs embarrassment, which is not sufficient to sustain a claim. Neither is Kochenderfer's possible participation in the text thread sufficient. Plaintiffs have not alleged that Kochenderfer himself wrote any of the highly objectionable texts.[15] Their allegation against him (the Court presumes) is that he should have spoken up and condemned the texts.[16] But Plaintiffs never explain how that could be construed as adverse actions taken toward Plaintiffs in retaliation for First Amendment speech.

The only adverse action Plaintiffs allege was taken by Inkelaar, Zamorano, and the FOP is the following: "Inkelaar, acting on the FOP's behalf, issued a press release stating, 'we [the FOP] can no longer sit in silence as the City of Wichita Department and the Wichita Police Department try to move the blame for their poor leadership and decision-making to the FOP." Doc. 74 at 10.

---

[15]  Plaintiffs allege that Kochenderfer criticized Ramsay in some text messages. Its unclear how this would be retaliation against Plaintiffs. Even to the extent Kochenderfer used a nickname for Plaintiffs (i.e., "the gordettos"), that is not an adverse action. And again, there are no allegations that Kochenderfer sent, received, or was even directly included on the text thread with the highly offensive memes. Even if he were, that is not an adverse employment action taken by Kochenderfer toward Plaintiffs.

[16]  The memes and images in the texts are undoubtedly extremely offensive and vulgar. Plaintiffs have included them in the first amended complaint and in all the response briefs perhaps to emphasize that point. What is less clear is what claim they assert based on those texts. To the extent Plaintiffs link Kochenderfer to the texts, none of the constitutional claims levied against Kochenderfer in his individual capacity are based on the texts. To the extent Plaintiffs rely on the texts as support for claims against other Defendants, they have failed to plead any facts linking them to the texts. See supra Section III.B.1. (discussing the personal participation requirement for § 1983 claims).

Plaintiffs extrapolate from this allegation that "[i]t doesn't take much to deduce that the FOP worked to push Ramsay and Plaintiffs out." *Id.* at 11. But it is not a reasonable inference to draw from this statement that Inkelaar, Zamorano, or the FOP actually took adverse actions against Plaintiffs. It is such a stretch that Inkelaar and Zamorano conclude in their reply brief that Plaintiffs "do not allege that Inkelaar or Zamorano, in their individual capacities, retaliated against them . . . ." Doc. 83 at 2. The Court agrees. Plaintiffs fail to plausibly allege that Inkelaar, Zamorano, or the FOP personally participated in taking an adverse action in retaliation for Plaintiffs' speech.

Based on this analysis, the Court finds Plaintiffs' claim for First Amendment retaliation must be dismissed against all individual Defendants. As with Count One, this alternatively entitles all individual Defendants to qualified immunity. First, as discussed above, Plaintiffs have not alleged a viable constitutional violation by any individual Defendant. Second, and alternatively, Plaintiffs have done nothing more than identify general First Amendment law. They have not identified specific First Amendment law that would make it "sufficiently clear that every reasonable official would have understood" his conduct to have violated Plaintiffs' right not to be retaliated against for their speech. This omission is particularly notable as to Plaintiffs' subordinates, i.e., Kochenderfer, Nicholson, and possibly Inkelaar and Zamorano.[17] Defendants contend that subordinates cannot be liable for retaliation based on speech, citing *Trant v. Oklahoma*, 754 F.3d 1158, 1170 n.5 (10th Cir. 2014) (stating that "[w]e have never held that true subordinate employees may be liable for First Amendment retaliation claims" and declining to decide the issue). Thus, any subordinates are separately entitled to qualified immunity on this claim

---

[17]   It seems likely that this principle also bars the retaliation claims against Inkelaar and Zamorano. They were WPD officers in addition to their FOP roles. But regardless of their role, the retaliation claims are not plausible against them.

because it is not pursuant to clearly established law. *Muhammad v. Hall*, 674 F. App'x 810, 813 (10th Cir. 2017).

Finally, as with Count One, the failure of Plaintiffs to state any constitutional violation against an individual Defendant also means their claims against the City and the FOP (to the extent it is a state actor) also fail under *Monell*. Accordingly, Plaintiffs' First Amendment retaliation claims are dismissed as to all Defendants.

### b. Hostile Work Environment

Plaintiffs claim that Defendants subjected them to a hostile work environment because of their speech. Plaintiffs included this claim in the heading for Count Two, but they make few allegations in support. Nevertheless, the Court considers the allegations that are made and evaluates the claim, assuming that such a claim for a speech-based retaliatory hostile work environment exists under § 1983.

To sufficiently plead a hostile work environment claim, a plaintiff must "plead facts sufficient to show that the work environment 'is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Brown v. LaFerry's LP Gas Co.*, 708 F. App'x 518, 520 (10th Cir. 2017) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)). There must be facts pleaded showing that the work environment is both subjectively and objectively hostile. *Id.* "[Run-of-the-mill] boorish, juvenile, or annoying behavior" is not sufficient, nor are a few isolated incidents. *Throupe v. Univ. of Denver*, 988 F.3d 1243, 1252 (10th Cir. 2021) (internal quotation and citation omitted). Where "none of the acts [a plaintiff] complains of, either considered alone or in combination, can be said to have altered the conditions of

27

employment such that the atmosphere was abusive . . . dismissal for failure to state claim is proper." *Chand v. Braithwaite*, 2020 WL 9209284, at *2 (D.S.C. 2020).

Typically, in evaluating whether conduct was sufficiently severe or pervasive for purposes of a hostile work environment claim, courts consider the totality of the circumstances, including "such factors as the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Throupe*, 988 F.3d at 1252 (internal quotation and citation omitted). This includes consideration of the environment overall. *See Hicks v. Gates Rubber Co.*, 833 F.2d 1406, 1415-16 (10th Cir. 1987) ("Evidence of a general work atmosphere therefore—as well as evidence of specific hostility directed toward the plaintiff—is an important factor in evaluating the claim.").

The analysis is necessarily somewhat different in the context of a § 1983 claim. *See Raspardo v. Carlone*, 770 F.3d 97, 114 (2d Cir. 2014) ("This case demonstrates how hostile work environment claims that may readily be brought against employers under Title VII do not always fit easily within the context of individual liability under § 1983."). Claims under Title VII seek to hold an employer liable. It therefore makes sense to consider the conduct of multiple employees or supervisors in determining whether the working environment was hostile overall. *See id*. Section 1983, in contrast, focuses on individual liability. *Id*. at 115; *see also Henry*, 658 F.3d at 1241. This means that "when a plaintiff alleges that multiple individual defendants have engaged in uncoordinated and unplanned acts of harassment, each defendant is only liable under § 1983 when his own actions are independently sufficient to create a hostile work environment." *Raspardo*, 770 F.3d at 115 (addressing issue in context of a qualified immunity analysis).

Plaintiffs have not plausibly alleged a hostile work environment claim. Givens alleges that the following actions contributed to a hostile work environment:

> the pictures and messages that were circulated by WPD officers; the improper needling by Bezruki into her investigations; Bezruki maintaining that "slapping the ass" of a woman at work wasn't even sexual harassment; and a group of senior officers, defended by Bezruki, referring to Givens as a "Gordetto," referencing Ramsay, whom they called a "fucking tool."

Docs. 71 at 27; 72 at 22. Salcido's and Pinkston's allegations are more general. Pinkston alleges that he retired because of the hostile work environment. Salcido alleges that it was difficult for him to see the text messages from colleagues and that the racial animus exhibited within the WPD created a hostile work environment.

These allegations, which rely heavily on the offensive text messages, are insufficient to plausibly allege a constitutional violation by any individual Defendant. As noted, Plaintiffs have not identified which, if any Defendants, were part of the offensive text thread, or how the text thread created a retaliatory hostile work environment under the First Amendment. For the most part, no other specific conduct by most Defendants is identified, other than Bezruki.

The allegations that Bezruki failed to cooperate and failed to recognize the nature of sexual harassment do not plausibly create a "work environment [that] 'is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Brown*, 708 F. App'x at 520 (citation omitted). In short, Plaintiffs have failed to plausibly allege that any individual Defendant created a hostile work environment by his own actions.

Plaintiffs also again fail to show that the individual Defendants are not entitled to qualified immunity. Plaintiffs cite the general law governing freedom of speech claims. Docs. 71 at 6; 72 at 6 (both citing *Garcetti*, 547 U.S. 410 and *Pickering*, 391 U.S. 563). But they do not connect the

law to the hostile work environment allegations in this case. And any attendant claims against the City and the FOP (to the extent it is a state actor) also fail under *Monell*.

### 5.   Count III: § 1983 Fourteenth Amendment Due Process Claim

Count Three is a § 1983 claim for a Fourteenth Amendment due process violation. The claim is alleged by all Plaintiffs. The first amended complaint suggests the claim is asserted only against the City, Layton, Livingston, and Bezruki. Doc. 54 at 34. But Kochenderfer and Nicholson respond in their briefs as if the claim is also asserted against them, and Plaintiffs proceed as if it is. The FOP, Inkelaar, and Zamorano argue that the claim is not against them, and Plaintiffs don't dispute that. Thus, the Court will analyze this claim as if it is against the City, Layton, Livingston, Bezruki, Kochenderfer, and Nicholson.

A public employee's "liberty interest may be impinged if the Government imposed on him a stigma or disability, that foreclosed his freedom to take advantage of other employment opportunities." *Sipes v. United States*, 744 F.2d 1418, 1422 (10th Cir. 1984) (internal citation omitted). To state a claim, Plaintiffs must allege the following: (1) a government actor "makes a statement that "impugn[s] the good name, reputation, honor, or integrity of the employee"; (2) that statement is false; (3) "the statement is made during the course of termination and 'foreclose[s] other employment opportunities'"; and (4) publication of the statement. *McDonald v. Wise*, 769 F.3d 1202, 1212 (10th Cir. 2014); *see also Rich v. Sec'y of the Army*, 735 F.2d 1220, 1227 (10th Cir. 1984) (requiring publication); *Wulf v. City of Wichita*, 883 F.2d 842, 869 (10th Cir. 1989). The parties disagree over whether the third element requires <u>both</u> that the statement is made during the course of termination <u>and</u> that it forecloses other employment opportunities. Defendants contend they are conjunctive elements. Plaintiffs contend they are disjunctive.

Defendants' position is correct. A liberty interest claim "requires that the defamation occur in the course of the termination of employment." *Renaud v. Wyo. Dep't of Fam. Servs.*, 203 F.3d 723, 728 n.1 (10th Cir. 2000); *Stidham v. Peace Officer Standards & Training*, 265 F.3d 1144, 1154 (10th Cir. 2001). *But see McGhee v. Draper*, 639 F.2d 639, 643 n.2 (10th Cir. 1981) ("[W]e should not be interpreted as implying that discharge from employment is the exclusive context in which a 'tangible interest' can be entangled with a plaintiff's liberty interest for § 1983 purposes."). Mere foreclosure of other employment opportunities is insufficient without termination. And reputation damage alone isn't enough. *Brokers' Choice of Am., Inc. v. NBC Univ., Inc.*, 757 F.3d 1125, 1149 (10th Cir. 2014); *Melton v. City of Okla. City*, 928 F.2d 920, 926-27 (10th Cir. 1991).

The cases Plaintiffs cite in support of their position do not compel a different result. *See, e.g.*, *Lighton v. Univ. of Utah*, 209 F.3d 1213, 1223 (10th Cir. 2000); *Workman v. Jordan*, 32 F.3d 475, 481 (10th Cir. 1994). *Lighton* and *Workman* both recited the "in the course of termination" and the "foreclosure of other employment opportunities" elements in the disjunctive. But they also did not rely on those elements. In *Lighton*, there was no showing that the speaker's statements were false or impugned the plaintiff's good name. There was also no showing that the statements caused the plaintiff to resign or lose employment opportunities. In *Workman*, the plaintiff lost neither his job nor future employment activities. And *Renaud* and more recent Tenth Circuit authority have firmly rejected application of the elements in the disjunctive. Plaintiffs' argument is unavailing.

No Plaintiff's employment was terminated. Givens and Pinkston both claim constructive discharge. But Salcido remains an employee. And there was no termination proceeding during

which any Defendant made a false statement.[18] This forecloses Plaintiffs' due process claim against the City, Layton, Livingston, Bezruki, Kochenderfer, and Nicholson.

The due process claim fails for other reasons. Plaintiffs allege the following false statements:

- Layton: lied to the media about the text messages, issued a press release with false information about Plaintiffs' competence, and lied about the existence of the "skip letter."

- Livingston: falsely claimed that evidence of Nicholson's wrongdoing was unfounded.

- Bezruki: spread the rumor that Givens created a petition for women not to work with Mitchell.

- Kochenderfer and Nicholson: released false information to the *Wichita Eagle* about executive staff.

Doc. 71 at 16-17. The timing of these alleged defamatory statements do not line up with when Givens and Pinkston retired. Many of these statements are not even direct comments about Plaintiffs. They require a level of inference, i.e., inferring that a defamatory statement about "police leadership" is a statement about Plaintiffs. For some (such as Livingston's statement about Nicholson), it is not clear how the statement is at all defamatory toward Plaintiffs. Accordingly, the Court finds on these alternative grounds that Plaintiffs have failed to state a due process claim against Layton, Livingston, Bezruki, Kochenderfer, or Nicholson.

And Plaintiffs have identified no cases that would put Defendants on notice that their actions would constitute a Fourteenth Amendment violation, meaning the individual Defendants

---

[18]  Plaintiffs also claim they were entitled to due process on "potential discipline for their positions with the City of Wichita." But mere discipline does not "give rise to a right of due process unless the [discipline] caused a loss of stature or pay." *Heublein v. Wefald*, 784 F. Supp. 2d 1186, 1194 (D. Kan. 2011) (considering negative reports in personnel file). Nor is it clear what due process Plaintiffs claim they were entitled to for "potential discipline."

named are alternatively entitled to qualified immunity on this claim.[19] And as with the other claims, this claim fails against the City under *Monell*.

### 6.   Count Four: Claim for Disparate Treatment Pursuant to § 1983 (Equal Protection)

Count Four is a Fourteenth Amendment equal protection violation brought by Salcido and Givens against the City, Layton, Livingston, and Bezruki. The claim is not asserted against the FOP, Inkelaar, or Zamorano. As with Count Three, the first amended complaint does not suggest that Count Four is brought against Kochenderfer or Nicholson, but the parties treat it as if it is. Salcido alleges he was treated differently on the basis of race because his performance review included reference to his handling of the text-message scandal, while Pinkston's did not. Givens alleges she was treated differently because of her sex and race when Bezruki excluded her from the Mitchell investigation and because she filed a sexual harassment complaint against Bezruki. Doc. 54 at 34-35.

"In order to assert a viable equal protection claim, plaintiffs must first make a threshold showing that they were treated differently from others who were similarly situated to them." *Barney v. Pulsipher*, 143 F.3d 1299, 1312 (10th Cir. 1998); *Aramburu v. Boeing Co.*, 112 F.3d 1398, 1404 (10th Cir. 1997) ("Similarly situated employees are those who deal with the same supervisor and are subject to the same standards governing performance evaluation and discipline.").

---

[19] Plaintiffs cite *Lighton* and *Workman*, which do not provide clearly established law. They also cite *Bishop v. Wood*, 426 U.S. 341 (1976), and *Wisconsin v. Constantineau*, 400 U.S. 433 (1971). *Bishop* held that the discharge of an at-will public employee without public disclosure of the reasons for discharge did not violate the employee's liberty interest. 426 U.S. at 347-48. And *Constantineau* stated, "Where a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him, notice and an opportunity to be heard are essential." 400 U.S. at 437. Neither provide guidance "sufficiently clear that every reasonable official would have understood" his conduct to have violated Plaintiffs' due process rights. *Mullenix*, 577 U.S. at 11.

Salcido and Givens allege limited facts about how they were treated differently than others. This is somewhat understandable given that Plaintiffs made up the entire executive staff under Ramsay, arguably making each other the only relevant comparators. Salcido (who is Hispanic) alleges that the text scandal was mentioned negatively in his performance evaluation but not Pinkston's (who is white). But he does not allege who conducted his performance evaluation. Neither does he allege that the same person conducted both evaluations. Indeed, Salcido does not allege any personal action by any named Defendant. This alone warrants dismissal of Salcido's equal protection claim as to all Defendants.

Givens (who is an African American female) alleges that Bezruki excluded her from the investigation of Mitchell's conduct based on her sex and because she filed a complaint against Bezruki. This appears to be the entirety of Givens's equal protection claim. Because she only alleges action by Bezruki, Givens's equal protection claim is therefore dismissed against all other Defendants.

And there are problems with Givens's claim as asserted against Bezruki. She cites no support for the theory that being excluded from an investigation is an adverse employment action. *See EEOC v. PVNF, L.L.C.*, 487 F.3d 790, 800 (10th Cir. 2007) (identifying elements for a prima facie case, including an adverse action and circumstances supporting an inference of discrimination). And even if it did qualify as an adverse employment action, Givens fails to plead facts suggesting that Bezruki acted because of her sex. She cites (again) the vulgar text messages. But the text messages are not linked to Bezruki. The only connection that Givens can draw between the text thread and Bezruki is his alleged failure to address the situation promptly and appropriately and discipline the involved officers. This is insufficient to support an inference of discrimination by him. Her claim against Bezruki is therefore also dismissed.

Plaintiffs do not identify any law related to their equal protection claims in the sections of their briefs on qualified immunity. *See* Docs. 71 at 4-7; 72 at 4-8. This alternatively entitles the individual Defendants to qualified immunity on Count Four. Any remaining claim against the City on this count is also dismissed for failure to allege an underlying constitutional violation in accordance with *Monell*.

### 7.     Count Five: § 1983 Conspiracy Claim

Count Five is a § 1983 conspiracy claim. All Plaintiffs allege that all Defendants "participated by words and actions, and agreed or had a meeting of the minds to defame, punish, and drive out Plaintiffs . . . in violation of Plaintiffs' First and Fourteenth Amendment Rights." Doc. 54 at 35.[20]

To state a claim for conspiracy under § 1983, "a plaintiff must plead that he was deprived of a constitutional right as a result of a conspiracy comprised of or including conspirators acting under color of state law." *Leatherwood v. Rios*, 705 F. App'x 735, 739 (10th Cir. 2017). A federal conspiracy action under § 1983 "requires at least a combination of two or more persons acting in concert and an allegation of a meeting of the minds, an agreement among the defendants, or a general conspiratorial objective." *Brooks v. Gaenzle*, 614 F.3d 1213, 1227-28 (10th Cir. 2010), *abrogated on other grounds by Torres v. Madrid*, 592 U.S. 306 (2021). Conclusory allegations of conspiracy are insufficient; a plaintiff must instead plead specific facts to establish the requisite

---

[20]   There appears to be some confusion about whether Plaintiffs' conspiracy claim is also brought under § 1985. Under § 1985, it is unlawful to conspire to interfere with civil rights in certain circumstances. The amended complaint mentions § 1985 once in the introductory statement, but not in the specific conspiracy allegations. *See* Doc. 54 at 2; 35. Two groups of Defendants address § 1985 conspiracy in their opening brief. *See* Docs. 69 at 21; 70 at 19-21. Plaintiffs mention the statute in their responses but focus their argument on § 1983 conspiracy. *See* Docs. 71 at 21-22; 72 at 23-24; 73 at 20-21; 74 at 13-15. And Layton, Livingston, and Bezruki discuss § 1985 in their reply briefs. *See* Docs. 81 at 7-8; 84 at 7-8. But regardless of whether Plaintiffs intended to assert the claim, § 1985 requires an underlying equal protection claim. *Beztak Land Co. v. City of Detroit*, 298 F.3d 559, 568-69 (6th Cir. 2002). The viable underlying claim is missing here. *See supra* Section III.B.6.

elements. *Id.* at 1228. A single plan is required. *Frasier v. Evans*, 992 F.3d 1003, 1024-25 (10th Cir. 2021).

There are two problems with Plaintiffs' federal conspiracy claim. First, any allegations of an agreement or meeting of the minds are conclusory. *See, e.g.*, Doc. 54 at 20 ("The minds of Mr. Bezruki and Mr. Layton met, numerous times, on the objective of harming Plaintiffs' careers while discrediting and defaming them."); *id.* at 23 ("Defendants conspired to drive out Plaintiffs . . . ."); *id.* at 35 ("Defendants participated by words and actions, and agreed or had a meeting of the minds to defame, punish, and drive out Plaintiffs from their positions as the executive staff of the WPD. . . ."). And second, there is no underlying constitutional violation. A § 1983 conspiracy claim cannot lie without an underlying constitutional violation. Plaintiffs have not plausibly pleaded a viable one. This means their conspiracy claim, too, must fail. The Court dismisses Plaintiffs' § 1983 conspiracy claim against all Defendants.[21]

### C.   Other Federal Claims

#### 1.   Count Nine: Givens's Title VII Claim

Count Nine is a Title VII claim brought by Givens against the City and Bezruki. The first amended complaint primarily alleges that the City and Bezruki retaliated against Givens and created a retaliatory hostile work environment. Doc. 54 at 38-39. In their response briefs, Plaintiffs concede this claim is only against the City. *See, e.g.*, Doc. 71 at 26; Doc. 72 at 22.[22] But Plaintiffs do not clarify the precise nature of this claim, i.e., whether it is based on race, sex, retaliation, focuses on discrete acts, or alleges a hostile work environment, or some combination of all of these.

---

[21]   The individual Defendants do not raise qualified immunity as an alternative defense to the conspiracy claim.

[22]   A Title VII claim against Bezruki in his individual capacity (or any other non-employer defendant) is improper. *Haynes v. Williams*, 88 F.3d 898, 901 (10th Cir. 1996).

These claims, regardless of how characterized, suffer from some of the same problems as Givens's constitutional claims for retaliation, disparate treatment, and hostile work environment. The same elements apply. *See Carney v. City & Cnty. of Denver*, 534 F.3d 1269, 1273 (10th Cir. 2008); *Etsitty v. Utah Transit Auth.*, 502 F.3d 1215, 1227 (10th Cir. 2007), *overruled on other grounds by Bostock v. Clayton Cnty.*, 140 S. Ct. 1731 (2020) ("In disparate-treatment discrimination suits, the elements of a plaintiff's case are the same whether that case is brought under §§ 1981 or 1983 or Title VII." (citation omitted and internal quotation marks omitted)). But Givens bears a lower burden under Title VII. *Miller v. Regents of Univ. of Colo.*, 1999 WL 506520 at *10-11 (10th Cir. 1999) ("More is required to state a claim for a constitutional violation . . . than for a statutory claim under Title VII." (citation and internal quotation marks omitted)).

Even when held to a lower standard, Givens fails to plausibly allege facts connecting any unfavorable treatment to her race, sex, or protected activity.[23] She still fails to identify similarly situated individuals or explain how they were treated differently. She fails to make a connection between any protected activity and an adverse employment action.[24] And she fails to allege a hostile work environment so "permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an

---

[23] Givens asserts that the following allegations show that her protected activity was a motivating factor in Bezruki's retaliatory actions: Bezruki refused to cooperate with the City's investigation of her complaint, started a rumor about Plaintiff petitioning women not to work with Mitchell, and commented that "slapping a woman's ass" was not sexual harassment. Doc. 54 at 38. These allegations do not have the inferential impact Givens thinks they do.

[24] The closest Givens comes to identifying an adverse action motivated by her protected activity is her allegation that she filed a grievance against Bezruki about his "slapping the ass" statement and within a month he started a rumor about her and refused to cooperate with the investigation. These actions have a temporal connection but Plaintiff has not shown how they qualify as adverse employment actions.

abusive working environment."[25] *Brown*, 708 F. App'x at 520 (citation and internal quotation marks omitted). For the same reason, any claim for constructive discharge fails. *See id.* at 523.

Givens's Title VII claim is dismissed.

### 2.       Count Ten: Discrimination and Retaliation under 42 U.S.C. § 1981

Count Ten is a claim for discrimination and retaliation under 42 U.S.C. § 1981. Plaintiffs indicate that this claim is brought as an alternative to any § 1983 claims to the extent any Defendants are not state actors.

Section 1983 is the exclusive avenue for claims against state actors. *Bolden v. City of Topeka*, 441 F.3d 1129, 1135 (10th Cir. 2006). Race is the only valid basis for this claim. *See Lounds v. Lincare Inc.*, 812 F.3d 1208, 1221 (10th Cir. 2015).

Plaintiffs' intention appears to be to reserve a § 1981 claim against the FOP, Inkelaar, and Zamorano if the Court determines that they are not state actors.[26] But the Tenth Circuit has not extended § 1981's reach beyond employers and possibly supervisors. *See Iweha v. Kansas*, 2022 WL 1684697, at *8-9 (D. Kan. 2022). Plaintiffs do not allege that the FOP, Inkelaar, or Zamorano was their employer or supervisor. And Plaintiffs do not allege any facts to support an inference of racial animus by the FOP, Inkelaar, or Zamorano. *See id.* at 8. Accordingly, the Court thus dismisses the alternative § 1981 claim. Alternatively, the claim also fails for the same reasons the § 1983 claims fail.

---

[25] The Court considers the conduct of Defendants collectively for this claim, as opposed to the separate conduct of each individual Defendant as with the § 1983 claim. But it does not make a difference, because even when considered collectively, the alleged conduct does not create an objectively hostile work environment.

[26] There is no suggestion that any other Defendant was not acting under color of state law.

### D.    State Law Claims

The only claims that remain for consideration are state law claims for outrage, defamation, and civil conspiracy. There is no diversity jurisdiction in this case. The only way the Court maintains jurisdiction over the claims is by exercising supplemental jurisdiction over the state law claims based on the now-dismissed federal claims. The Court declines to do so.

A court has discretion to exercise supplemental jurisdiction over state law claims that derive from "a common nucleus of operative fact" as a pending federal claim. *City of Chicago v. Int'l Coll. of Surgeons*, 522 U.S. 156, 164-65 (1997); *see also* 28 U.S.C. § 1367(a). Courts consider whether the values of judicial economy, convenience, and fairness would be served by asserting supplemental jurisdiction over the state law claims. *Wittner v. Banner Health*, 720 F.3d 770, 781 (10th Cir. 2013). But a district court may decline supplemental jurisdiction when the claims over which it had original jurisdiction have been dismissed. 28 U.S.C. 1367(c)(3); *see, e.g.*, *Exum v. U.S. Olympic Comm.*, 389 F.3d 1130, 1138 (10th Cir. 2004); *Heffington v. Derby United Sch. Dist. 260*, 2011 WL 5149257, at *3 (D. Kan. 2011). Courts are cautious about exercising supplemental jurisdiction over state law claims. Notions of comity and federalism weigh in favor of state courts trying their own lawsuits. *Villalpando ex rel. Villalpando v. Denver Health & Hosp. Auth.*, 65 F. App'x 683, 688 (10th Cir. 2003) (citation omitted). Declining supplemental jurisdiction is a matter within a court's discretion. *See Nielander v. Bd. of Cnty. Comm'rs*, 582 F.3d 1155, 1172 (10th Cir. 2009).

Plaintiff's state law claims arise out of the same common nucleus of operative fact as the federal claims.[27] But beyond that fact, there is little reason to maintain jurisdiction. No case

---

[27]  A "common nucleus" was not easy to ascertain here, as the facts are so lengthy and broad. Nevertheless, the state law claims are based on the same allegations as the federal claims, so the Court assumes they are based on a common nucleus of operative facts.

management or discovery has occurred in federal court. The case has been stayed pending resolution of the motions to dismiss, so this Court has no vested interest in maintaining jurisdiction. And the remaining claims are better resolved by a state court. Kansas has a legitimate interest in interpreting and applying its own tort laws and principles of liability. And notions of comity support allowing Kansas courts to address matters of state law. The Court therefore does not reach the merits of any of the remaining state law claims and dismisses them without prejudice for lack of subject-matter jurisdiction.

### E.    Proposed Amendment

More than four months after the pending motions to dismiss became ripe, and while the Court was deciding those motions, Plaintiffs filed a second motion to amend their complaint. Doc. 85. Salcido has now administratively exhausted a Title VII claim and he seeks leave to add it to Count Nine with Givens's claim. It appears Pinkston has not completed exhaustion yet. Plaintiffs also ask to add a letter dated July 1, 2021 to the complaint and make some non-substantive changes to wording and grammar.

Under Rule 15(a)(2), where there is no absolute right to amend, "a party may amend its pleading only with the opposing party's written consent or the court's leave." Fed. R. Civ. P. 15(a)(2). Although Rule 15(a)(2) mandates that the court "freely give leave when justice so requires," leave may nonetheless be denied where the proposed amendment is "futile"—that is, where the amended complaint would be subject to dismissal. *Stewart v. Bd. of Comm'rs for Shawnee Cty., Kan.*, 216 F.R.D. 662, 664 (D. Kan. 2003); Fed. R. Civ. P. 15(a)(2). "The court may deny a motion to amend as futile if the proposed amendment would not withstand a motion to dismiss or otherwise fails to state a claim upon which relief may be granted." *Stewart*, 216 F.R.D. at 664. As such, the court must analyze a proposed amendment as if it were before the court on a

motion to dismiss. *Id*. The party opposing amendment bears the burden of establishing the proposed amendment's futility. *Boykin v. CFS Enter., Inc.*, 2008 WL 4534400, at *3 (D. Kan. 2008).

The Court denies leave to amend because Salcido's Title VII claim is futile as currently pleaded.[28] Salcido seeks to add allegations that the City, Bezruki, and Layton engaged in a pattern and practice of retaliation because he engaged in a protected activity.[29] He alleges that he opposed discriminatory conduct and systematic racism. He claims that Defendants "denied him employment opportunities and created a hostile work environment . . . because of his anti-racist reform efforts." Doc. 85-1 at 96. He repeats that he was treated differently than Pinkston in his performance review and claims again that Defendants retaliated against him by withholding pay, removing job duties, excluding him from meeting, issuing false press releases and a rigged survey, starting rumors, and taking other actions designed to force him to resign. And he claims in a conclusory fashion that his protected activities and the adverse actions taken against him were causally connected. The other changes Plaintiffs seek to make are non-substantive and do not change the outcome of the motion.

Salcido fails to state a Title VII claim for the same reasons he fails to state constitutional claims for retaliation, disparate treatment, and hostile work environment. The same analysis also applies here as it did for Givens. Salcido fails to plausibly allege facts connecting any unfavorable

---

[28] There are other reasons a court may deny leave to amend, including undue delay and undue prejudice. *See Foman v. Davis*, 371 U.S. 178, 182 (1962). Some Defendants make these arguments in addition to futility. *See* Docs. 90 at 2; 91 at 2. And the FOP, Inkelaar, and Zamorano actually do not object to Plaintiffs' motion at all (with certain caveats). Doc. 92. But the Court does not address the other arguments because futility is dispositive.

[29] Givens conceded that her claim was only against the City. Salcido does not. He seems to want to pursue his Title VII claim against Bezruki and Layton in their official capacities. Docs. 94 at 2; 95 at 5. But the proposed second amended complaint still only names them in their individual capacities. Doc. 85-1 at 56. In any event, Salcido's proposed Title VII claim against the City, Bezruki, and Layton (even if in their official capacities, which are duplicative of a claim against the City) remains futile as pleaded.

treatment to his race, color, or protected activity. He still fails to identify similarly situated individuals (other than Pinkston) or explain how they were treated differently. He fails to factually connect any protected activity with an adverse employment action.  And he fails to allege a hostile work environment so "permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment."[30] *Brown*, 708 F. App'x at 520 (citation and internal quotation marks omitted). For the same reason, any claim for constructive discharge fails. *See id.* at 523. The Court denies Plaintiffs leave to amend based on futility.

The Court is aware that Pinkston may still be waiting for his right-to-sue letter. He may or may not have a viable Title VII claim of his own. But if he eventually files a claim, he would do well to take note of the rulings in this order and address the pleading deficiencies identified throughout if he wants to proceed in federal court.

## IV.    CONCLUSION

Plaintiffs try to paint a picture of the WPD, the City of Wichita, and the FOP as a single-minded, power-hungry machine that barrels over anyone in its way. But they repeatedly rely on broad and conclusory allegations instead of individualizing their claims by Plaintiff and Defendant. Accusing individuals of unconstitutional conduct requires more specificity. Further, where an individual's conduct is distasteful, impolite, or even abhorrent, it does not automatically translate into a viable cause of action. It is a plaintiff's job to connect the dots, and Plaintiffs have largely failed to do so here.

---

[30]    As with Givens, the Court considers the conduct of Defendants collectively for this claim, as opposed to the separate conduct of each individual Defendant as with the § 1983 claim. But it does not make a difference, because even when considered collectively, the alleged conduct does not create an objectively hostile work environment.

The Court further notes that it has studied the first amended complaint and briefs <u>at length</u>. It has dedicated considerable judicial resources and endeavored to be as detailed as possible throughout this order. But this has often required it to take the laboring oar in discerning and analyzing the claims, which ought to have been handled by Plaintiffs. Ultimately, the Court finds that the case should be dismissed in its entirety. Some claims are dismissed with prejudice and some without. These outcomes are summarized here:

- The constitutional claims (Counts One, Two, Three, Four, Five, and Ten) are dismissed WITH PREJUDICE. The Court finds dismissal with prejudice as to all these claims is warranted for the following reasons. Counts One, Three, and Ten are legally untenable as discussed above. Counts One, Two, Three, and Four are also dismissed with prejudice because Plaintiffs fail to overcome—or even meaningfully attempt to overcome—claims of qualified immunity by the individual Defendants. They have likewise made little if any attempt to establish *Monell* liability against the City and, to the extent it would apply, the FOP. Finally, Plaintiffs have failed to state a claim as to all these Counts. This is true even though Plaintiffs were able to file an amended pleading well after an initial round of motions to dismiss. Many of the pleading deficiencies identified here were raised in those motions, and Plaintiffs failed to address them. Even after the current round of motions, Plaintiffs failed to try to correct the above deficiencies, either through additional amended pleadings or arguments in the briefs. The Court will sometimes dismiss deficient pleadings without prejudice where it appears the problems can be addressed in a subsequent pleading. Plaintiffs have not shown an ability or willingness to do so here and instead have passed over opportunities to do so. Dismissal with prejudice on these claims is therefore appropriate. *See Rollins v. Wackenhut Servs., Inc.*, 703 F.3d 122, 132-33 (D.C. Cir. 2012) (Kavanaugh, J., concurring) (explaining that dismissal under Rule 12(b)(6) is generally with prejudice unless stated otherwise and that opportunities to amend under Rule 15 in response to motions to dismiss provide a fair opportunity for a plaintiff to avoid such a result).

- Counts Six, Seven, and Eight are dismissed WITHOUT PREJUDICE for lack of subject matter jurisdiction.

- Count Nine is dismissed WITHOUT PREJUDICE to the extent it is asserted against the City because dismissal is based on pleading deficiencies. The Court distinguishes Plaintiffs' ostensible Title VII claims from the constitutional claims because the pleading standard is somewhat less burdensome. *See Miller*, 1999 WL 506520 at *10-11. This claim also does not invoke qualified immunity, which generally favors dismissal with prejudice. However, to the extent Count Nine is asserted against Bezruki, that claim is dismissed WITH PREJUDICE.

- All Counts are alternatively dismissed WITHOUT PREJUDICE for failure to comply with Rule 8.

As to the claims that the Court dismisses without prejudice, the Court cautions Plaintiffs against refiling a similar complaint with collective allegations or pleadings that violate Rule 8.[31] In any future pleadings, it should not be so difficult to ascertain which claims are brought by and against which parties, and for what conduct.

THE COURT THEREFORE ORDERS that the motion to dismiss filed by Defendants Fraternal Order of Police, David Inkelaar, and Paul Zamorano (Doc. 65) is GRANTED.

THE COURT FURTHER ORDERS that the motion to dismiss filed by Defendant Chris Bezruki (Doc. 67) is GRANTED.

THE COURT FURTHER ORDERS that the motion to dismiss filed by Defendants Kevin Kochenderfer and Wendell Nicholson (Doc. 68) is GRANTED.

THE COURT FURTHER ORDERS that the motion to dismiss filed by Defendants Robert Layton, Troy Livingston, and City of Wichita (Doc. 70) is GRANTED.

THE COURT FURTHER ORDERS that the motion to amend filed by Plaintiffs (Doc. 85) is DENIED.

The case is closed.

IT IS SO ORDERED.

Dated: March 20, 2024                    /s/ Holly L. Teeter
                                         HOLLY L. TEETER
                                         UNITED STATES DISTRICT JUDGE

---

[31]   As discussed throughout, the Court finds dismissal is appropriate here instead of amendment.